(89 South. 590)

DANCY et al. v. BAKER. (8 Div. 242.)

(Supreme Court of Alabama. May 12, 1921. Rehearing Denied June 23, 1921.)

**1. Work and labor. ⬤⇒4(1)—No compensation for services in absence of agreement.**

No one has the legal right to charge another for services rendered unless he had been employed by that other by contract express or implied.

**2. Brokers ⬤⇒57(2) — Though broker must procure purchaser at price set, he is not deprived of commission because parties conclude different contract.**

A broker who undertakes to find a purchaser for land at a stipulated price earns his commission when he procures and produces to his principal a person who is able, ready, and willing to buy at that price, and he does not earn his commission if he fails to produce such a purchaser; but, if a broker has brought the parties together and they conclude a contract, he is not deprived of his right to a commission

by the fact that the contract differs in terms from the one which he was authorized to negotiate, provided the negotiations commenced by the broker continued uninterruptedly.

**3. Brokers ⬤⇒56(3)—Broker held not entitled to commission after negotiations ceased and principal was not informed of subsequent attempt to sell.**

Where broker failed to bring his customer up to price fixed for land by his principal, and the customer refused to pay the price, and negotiations ceased, was not entitled to a commission where a sale was made by the principal to such customer some months later at a less price, though the broker induced the customer to again look at the land, where the broker did not inform his principal that he was still attempting to make a sale to such customer, and there was no reason why the principal should know that the customer was sent to him at such time by the broker; customer making a statement at the time that he was sent there by some one else.

**4. Brokers ⬤⇒88(1)—Fraud or bad faith of principal held for jury.**

In action by broker to recover commissions on sale of land by principal, where the evidence is in conflict on issue of fraud or bad faith on the part of the principal, that issue is to be submitted to jury.

**5. Brokers ⬤⇒86(1) — Evidence insufficient to sustain finding of bad faith on part of principal.**

In action by broker to recover commissions on sale of land by principal to former customer of plaintiff at a less price than that fixed between the broker and principal, *held*, that there was no sufficient evidence to warrant a finding of bad faith or purpose to interfere with plaintiff's operations on the part of the principal.

Appeal from Circuit Court, Morgan County; Horace C. Wilkinson, Judge.

Action by T. L. Baker against Mary Lou Dancy and another in assumpsit. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

In 1912 by a written contract plaintiff was authorized by defendants to find a purchaser for their land at the price of $100,000. After the expiration of the contract, which ran for one year, defendants priced their land at $150,000, and, according to plaintiff's testimony, he was verbally authorized to find a purchaser at that price, and took several prospectors out to look at the land and in 1915 he conducted about a dozen persons over the land, but never found any one who was willing to pay more than $125,000. In August, 1915, he showed the land to Oscar Bond, of the firm of Bond Bros., who actually bought the land in January, 1918. After Bond left in 1915, defendants offered to sell at $136,000 or $137,000, but Bond did not offer this amount, and the matter was dropped. In the fall of 1915, or a little later, plaintiff

took two other persons over the land, but they did not offer to buy. Nothing further occurred until September, 1917, when, according to plaintiff's evidence, he went to defendant's place and talked with Mrs. Unity Dancy, one of the defendants, informing her that he was in correspondence with Bond Bros., of Tennessee, who were able to buy and pay cash for the place if they liked it. Plaintiff testified:

"She then asked me, if I was able to find a man to pay cash, what would my charges be, and I told her that, if I found a man able to pay the price she asked, it would come to a little more than $7,000. My commission at the usual price was 5 per cent. She told me that would be too much commission, too high she said, and I told her that was the usual rate. * * * I told her it would be 5 per cent. of the sales price. She fixed the price, and I found the purchaser."

Thereupon plaintiff wrote to Bond Bros. to come at once and see the place, and O. S. Bond and another man came and went over it with plaintiff, and on that occasion he saw Miss Unity and informed her who the visitors with him were, and that they would pay $125,000, but she declined to consider that price. Afterwards, still in the summer of 1917, he again corresponded with Bond Bros., and on their suggestion he inquired of defendants whether they would reduce the price, but they refused to do so. During the same summer plaintiff met defendants in Decatur and asked if he could bring parties out to see the land, and they said, as they wanted to sell it, to bring them out. Thereafter plaintiff had no further communication with the defendants, and they were never informed of his later efforts to interest Bond Bros. in buying their place. About December 18, 1917, plaintiffs met one of the Bonds in a Tennessee town and discussed it with him, and Bond agreed to come down after the holidays and decide whether he would buy the place or not, and early in January, 1918, two members of Bond Bros. came down and met plaintiff at a Decatur Hotel. They proposed for plaintiff to show them another tract they were interested in, and said they would go out to the Dancy place on the next day. Plaintiff told them he would go to the Dancy place with them but for the fact that he had another engagement, and they said it was not necessary, as they knew the place already. The Bonds went out, and their visit resulted in their purchase of the place from defendants for $130,000. With the exception stated, as to the single occasion in August, 1918, defendants always demanded $150,000 in cash for the place, and refused to consider anything less. As to his transactions with the Bond Bros., plaintiff's testimony is substantially corroborated by the testimony of O. S. Bond, except that Bond stated that plaintiff had showed his firm the

land only once in 1915. The defendants expressly denied that plaintiff ever had any authority or commission to sell the land or to find a purchaser after the expiration of his written contract, and they further affirm that they never went further than to tell him that they wanted to sell the place and would sell to his customers just as they would to any one else for the cash price for which they were willing to sell. The undisputed evidence is that plaintiff did not notify defendants after September, 1917, that he was negotiating with Bond Bros., or that he was instrumental in sending them to the defendants in January, 1918, but that, on the contrary, Bond informed her on that occasion that he was sent to them by W. F. Garth, their cousin, with whom Bond had been talking a day or two before, and who advised him to buy the place. Bond testified:

"When we got out there, Miss Dancy repudiated any connection with Mr. Baker, and gave us a price that Mr. Baker had never given us."

E. W. Godbey, of Decatur, for appellants.

There was a total abandonment of the project by Baker. 187 Ala. 41, 65 South. 518; 61 N. Y. 415; 204 U. S. 460, 27 Sup. Ct. 346, 51 L. Ed. 566; 8 Ariz. 176, 71 Pac. 967; 9 C. J. 613. On the evidence, he was not entitled to any compensation. 177 Ala. 636, 59 South. 286; 55 Fla. 346, 45 South. 1014; 57 Fla. 180, 49 South. 125. Baker's failure to interest a purchaser at the price always exacted by defendants rendered defendants free to sell at their own terms, without liability to Baker. 103 Ala. 641, 15 South. 900; 187 Ala. 41, 65 South. 518; 195 Ala. 236, 70 South. 273; 9 C. J. 607; 165 Mich. 633, 131 N. W. 105, 34 L. R. A. (N. S.) 1054; 21 S. D. 619, 114 N. W. 998, 15 L. R. A. (N. S.) 272, and authorities supra. Baker was not the efficient, direct, procuring cause, within a reasonable time. 7 Ala. App. 358, 62 South. 254, and authorities supra.

Callahan & Harris, of Decatur, for appellee.

An employment was implied from the course of dealings between the parties for several years. 83 N. Y. 378, 38 Am. Rep. 442. Baker's commission was to find a purchaser, which he did, and the owner may waive the terms given the broker, and sell at reduction without affecting the broker's right to the commission. 4 R. C. L. 313; 162 Ala. 38, 50 South. 340; 177 Ala. 636, 59 South. 286; 57 South. 79; 203 Ala. 191, 82 South. 441. As to who procured the purchaser is a question for the jury. 177 Ala. 636, 59 South. 290. It is not necessary that the broker be present and participate in the sale. 180 Ala. 541, 61 South. 72, and authorities supra. See, also, 103 Me. 224, 68

Atl. 860, 16 L. R. A. (N. S.) 433, 12 Ann. Cas. 1083, and 9 C. J. 520; 116 Ala. 396, 22 South. 540; 162 Ala. 433, 50 South. 381, 136 Am. St. Rep. 52.

SOMERVILLE, J. [1] In Stevens v. Bailey, 149 Ala. 256, 42 South. 740, it was said:

"No one, it would seem, on sound principle, has the legal right to charge another for services rendered, unless he had been employed by that other, by contract, express or implied, that he would compensate him therefor."

Under the evidence before the trial court, it is clear that the jury would have been warranted in finding that defendants agreed with plaintiff, in September, 1917, to pay him a commission of 5 per cent., or at least a reasonable commission, for finding and producing a purchaser for their land who would be able, ready, and willing to buy it on defendants' terms, viz. $150,000 in cash.

So, also, there was evidence to support a finding by the jury that plaintiff was an efficient procuring cause of the purchase by Bond Bros.

But the undisputed evidence shows that Bond Bros. purchased through a direct personal transaction with defendants, for the price of $130,000, of which $10,000 was paid in cash, and the balance in 60 days; that the negotiations between plaintiff and Bond Bros. on the basis of $150,000, of which defendants were informed in September, 1917, were broken off by the refusal of Bond Bros. to pay that price, and the refusal of defendants to take less; that Bond Bros. had never been ready and willing to pay any price approximating defendants' demand, nor, indeed, to pay any more than was actually paid; and that defendants were not only not informed by plaintiff that he was still attempting to lead Bond Bros. up to a purchase, but that they were in fact informed by Bond Bros. that they came direct to defendants to discuss a deal for the land, at the instigation of their relative, W. F. Garth.

[2] On elementary principles of law, a broker who undertakes to find a purchaser at a stipulated price earns his commission when he procures and produces to his principal a person who is able, ready, and willing to buy at that price. Randley v. Shaffer, 177 Ala. 636, 651, 59 South. 286; Henderson v. Vincent, 84 Ala. 99, 4 South. 180; Bailey v. Smith, 103 Ala. 641, 15 South. 900; Cook v. Forst, 116 Ala. 395, 22 South. 540; Stevens v. Bailey, 149 Ala. 256, 261, 42 South. 740. And, conversely he does not earn his commission if he fails to produce such a purchaser.

But the general rule is subject to an important qualification. Courts are not disposed to allow a broker's undertaking, in process of accomplishment, to be defeated by any fraud or inequitable conduct on the part of his principal, whereby the principal would profit by the broker's service and at the same time evade a just liability to make due compensation.

"If a broker has brought the parties together, and as a result they conclude a contract, he is not deprived of his right to a commission by the fact that the contract so concluded differs in terms from the one which he was authorized to negotiate, particularly where the customer procured is able, ready, and willing to enter into a contract on the terms mentioned in the broker's authorization." 9 Corp. Jur. 600, § 89.

"However, to entitle a broker to a commission, where the contract concluded differs from that which the broker was authorized to negotiate, the negotiations commenced by the broker must have continued uninterruptedly, and he must have been actively instrumental in causing the parties to consummate the transaction. So, if the principal and customer introduced by the broker cannot agree on the terms of a sale, and the broker or his customer drops the negotiations, * * * the broker is not entitled to a commission on a sale being subsequently made by the principal, acting either independently or through another broker, to the same customer on different terms." Id. 602.

In the application of the general rule to particular cases the decisions of the various courts have not always been consistent in the results attained.

[3] If the broker has found and begun negotiations with a prospective purchaser, the principal cannot interfere, and, either revoking the broker's authority or proceeding without his aid or participation, himself effect a sale either at the stipulated price, or at a lower price, and thereby evade his liability for a commission. Henderson v. Vincent, 84 Ala. 99, 100, 4 South. 180. But, if the broker fails after a reasonable time to induce his customer to purchase, then the principal may proceed to a sale himself without liability to the broker. Hutto v. Stough, 157 Ala. 566, 571, 47 South. 1031; Smith v. Sharpe, 162 Ala. 433, 439, 50 South. 381, 136 Am. St. Rep. 52. But in such a case it is said that fair dealing would require notice from the principal to the broker of the former's intention. Cook v. Forst, 116 Ala. 395, 22 South. 540; Henderson v. Vincent, 84 Ala. 99, 100, 4 South. 180.

Where the principal has thus interrupted negotiations between the broker and his customer and has himself effected a sale at a lower price than the broker was authorized to negotiate for, the principal is held liable for the broker's commission on the theory that the principal, by his interruption, has deprived the broker of the opportunity to bring his customer up to the authorized price, and hence that he has waived that requirement of the broker. Smith v. Sharpe, 162 Ala. 433, 439, 50 South. 381, 136 Am. St. Rep. 52; Paschall v. Gilliss, 113 Va. 643, 75 S. E. 220, Ann. Cas. 1913E, 778, and note, 784; Ball v.

Dolan, 21 S. D. 619, 114 N. W. 998, 15 L. R. A. (N. S.) 272, note.

And again:

"Where a broker, instead of procuring a person who is ready, able, and willing to accept the terms his principal authorized him to offer at the time of his employment, procures one who makes a counter offer more or less at variance with that of his employer, the latter is at perfect liberty either to accept the proposed party upon the altered terms or to decline to do so. If he accepts, he is legally obligated to compensate the broker for the services rendered; but, if he refuses, he incurs no liability whatever." 4 R. C. L. 313, § 52.

The evidence in the case before us does not bring it within either of the rules above enunciated.

Defendants did not interrupt the negotiations between plaintiff and Bond Bros., which had terminated unsuccessfully in September, 1917, nearly four months before Bond Bros. came to them for direct negotiations in January, and which, so far as they knew or had cause to believe, had not been renewed between them. Bond Bros. had never made a counter offer as to price, and had never entertained a purpose or willingness to buy at defendants' authorized price, nor at any reasonable approximation of that price; and, ostensibly, plaintiff's efforts to meet defendants' price requirement had completely failed.

Conceding, therefore, that plaintiff was the efficient procuring cause of Bond Bros.' resumption of negotiations and final purchase in January, 1918, at the price of $130,000, the final and decisive inquiry is whether or not defendants knew or had notice of the fact that Bond Bros. came to negotiate and bid for the land by reason of the renewal of plaintiff's efforts in that behalf, and, if not, whether it was plaintiff's duty to so inform them before they concluded a sale for a substantially smaller consideration.

Upon a careful review of the evidence, we are of the opinion that it is without any tendency to show such knowledge by or notice to defendants. On the contrary, the only information defendants had as to the origin of Bond. Bros.' renewed activity was their own direct and specific statement that they had just been discussing the matter with defendants' kinsman, Garth, and that he had sent them to defendants on this occasion. Having heard nothing from' or of plaintiff in this connection for more than three months, they had a right to rely upon this statement by Bond Bros., and were under no duty to inquire as to plaintiff's possible activity in bringing about that result.

Under these circumstances we think it was the duty of plaintiff to inform defendants that he had resumed negotiations with Bond Bros., and was sending them as his customer on this occasion. Handley v. Shaffer, 177 Ala. 636, 652, 654, 59 South. 286; Skinner Mfg. Co. v. Douville, 57 Fla. 180, 49 South. 125; Quist v. Goodfellow, 99 Minn. 510, 110 N. W. 65, 8 L. R. A. (N. S.) 153, 9 Ann. Cas. 431. Failing to do so, defendants could be and were misled as to their obligations in the matter; and, without warning as to plaintiff's activity or claim of a commission, they reduced the purchase price to a figure very substantially lower than anything previously considered by them as satisfactory.

We do not overlook the rule recognized in Handley v. Shaffer, supra, that where a broker is employed merely to find a purchaser, with whom his principal is to negotiate a sale upon whatever terms may be agreed upon as satisfactory, the broker's right to a commission does not depend upon his principal's knowledge of the fact that a purchaser to whom he has thus sold was sent to him by the broker. That rule of liability seems to be well settled. But where the broker is authorized to find and produce a purchaser only at a specified price and on specified terms, his commission being expressly made dependent upon a sale at that price (as is here the case), that rule of liability cannot be justly applied, unless the purchaser who presents himself to the principal is able and ready and offers to buy at the price and on the terms specified. Such an offer would be sufficient notice of the source of the purchaser, if notice were required; and, in any event, the absence of notice or knowledge could not prejudice the principal.

In Henderson v. Vincent, 84 Ala. 99, 101, 4 South. 180, wherein most of the material factors upon which liability for a commission was asserted were like those here presented, the court said:

"It may be conceded that the real purchaser was procured by the efforts of the plaintiffs, and, if the property had been sold to him for the sum fixed by the contract under which plaintiffs were employed, the defendant would have been liable to them for commissions. The defendant cannot be held to have waived the stipulation of the contract as to price, when he had no knowledge, and no reason to believe, that Hibart [the purchaser] would pay the stipulated price."

The instant case is stronger for defendants in that they knew that the purchaser had refused to pay the authorized price. See, also, Bailey v. Smith, 103 Ala. 641, 15 South. 900, wherein this factor is discussed, and its presence given controlling effect.

It is the doctrine of a number of well-considered cases that, where the broker has failed to bring his customer up to the price fixed by his principal, and the customer has refused to pay that price, and negotiations have ceased, the principal may himself sell to that customer at a lower price without liability to the broker for a commission. Ball

v. Dolan, 21 S. D. 619, 114 N. W. 998, 15 L. R. A. (N. S.) 272; Johnson v. Wright, 124 Iowa, 61, 99 N. W. 103; Childs v. Ptomey, 17 Mont. 502, 43 Pac. 714; McArthur v. Slauson, 53 Wis. 41, 9 N. W. 784; Schano v. Storch, 56 Misc. Rep. 484, 107 N. Y. Supp. 26.

[4, 5] Where the evidence is in conflict, or may support an inference of fraud or bad faith, that issue is, of course, to be submitted to the jury. But we can discover nothing in the evidence before us which would warrant a jury in finding that defendants' sale to Bond Bros. was infected by fraud or bad faith with respect to their known obligation to plaintiff—nothing, in short, to show a purpose to interfere with his operations, or to prevent the fruition of a sale in accordance with the terms upon which alone they were obligated to pay him a commission. The circumstances, as testified to by Bond, that while they were closing the trade with defendants he asked one of them if Mr. Baker (the plaintiff) "would be taken care of," is without weight in that aspect, in view of her ignorance of any recent negotiations between Baker and Bond Bros., and her reply that "Baker had nothing to do with it."

Our conclusion is that upon the whole evidence plaintiff showed no right to recover any commission on the sale as made by defendants, and that the trial court erred in refusing to give for defendants the general affirmative charge as requested by them in writing.

The judgment will therefore be reversed, and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and THOMAS, JJ., concur.