EMMA E. TAYLOR, et vir, v. A. T. DORSEY

19 So. (2nd) 876                                    June Term, 1944
December 8, 1944                                         En Banc

*Maguire, Voorhis & Wells, H. M. Voorhis* and *W. H. Poe,* for appellants.

*G. P. Garrett* and *Lester Harris,* for appellee.

*Ethel Ernest Murrell,* as Amicus Curiae.

THOMAS, J.:

The appellee was awarded a judgment for the full amount he claimed, $2,250, in a suit against the appellant Emma E. Taylor for services rendered her in procuring a purchaser ready, willing, and able to buy certain land owned by her upon which was situated a hotel.

The issues were formed by a declaration claiming money payable for work done and services rendered, and pleas denying the debt and denying that a purchaser was secured for the agreed price or upon terms acceptable to the seller (defendant). Inasmuch as no attack was made upon any of the pleadings, and no challenge offered to the form of the action there is no need to discuss them further.

Four of appellants' questions are based upon the interpretation to be given the factual situation developed by the testimony, in which there is little conflict, and we think these may be further reduced to two propositions, namely, whether all terms of the seller were met by the prospective buyers, including the demand for a financial statement from the latter, and whether there was sufficient testimony to show the prospective purchasers not only ready and willing, but also able to buy the property.

No meeting between seller and broker occurred until the time of the trial, so the arrangements between them and between the seller and the prospective purchasers must be gleaned from the correspondence exchanged by seller and broker over a period of less than three months. During the correspondence the appellee and the proposed purchasers resided in Orlando, where the property is located, and the owner resided in the State of New York. The subject of sale was introduced by a letter from the appellee to the appellant expressing the understanding that the property had been taken off the market, but making a bid in rather obscure language for the opportunity to show it, nevertheless, to some clients. The reply was noncommittal. Shortly thereafter the broker, evidently not discouraged by the vagueness of the reply to his first letter, but assuming that there was some possibility the owner might be willing to sell at an advantageous price, advised the owner that he was interested in learning the lowest price she would take for the property. She then informed him she had under consideration an "all cash offer" and if that transaction did not materialize she would advise appellee, in which case she would "expect [him] to make . . . an offer." She added that she had not established any price on the hotel "except the asking price," which, she wrote, represented the actual investment irrespective of taxes, insurance, and repairs.

About two weeks later appellant further replied, announcing that the "all cash offer" had not yet materialized, but was still pending subject to prior sale. Then it was she stated the amount of the "asking price," $55,000. She said she would not offer the property for less, but would consider any reason-

able bid from any one wishing to buy. She stipulated that in any event she would expect $25,000 in cash. So, to recapitulate, her term "asking price" may be defined in the light of these letters as the initial value set by her, but not so fixed that she would decline consideration of a bid for some reasonable amount.

At the outset appellee had solicited the appellant-owner to allow him to exhibit the property to two persons interested in purchasing. Now we find him making offers in behalf of these clients.

Before proceeding with an analysis of the letters which followed it is well to pause and examine the authorities which have dealt with situations where a broker employed to procure a purchaser ready, willing, and able to buy secured one who made a counter offer which was eventually accepted by the seller. It seems that in such circumstances the owner is privileged to reject the counteroffer and escape liability for compensation, but if he accepts it he must pay the broker for his services. Swift v. Hale & Covington Real Estate Co:, 196 Ky. 446, 244 S. W. 867. If the broker has brought the parties together and a sale is effected as a result of continuous negotiations inaugurated by him, he will not be defeated in his effort to recover compensation simply because of a variation between the original terms stated by the owner and those finally accepted. Dancy, et al., v. Baker, 206 Ala. 236, 89 So. 590, 8 Am. Jur., Brokers, Page 1092.

We are well aware of the fact that the appellant-owner did not actually list the property in question with appellee for sale upon definite terms, but in response to his solicitation she did name the "asking price" and did encourage him to secure and submit a counteroffer. In such circumstances the principle which we have announced seems quite applicable, and we are convinced the broker was entitled to recover if he produced a purchaser ready, willing, and able to buy on terms finally agreeable to the owner. With this thought in mind we shall continue with the examination of the correspondence to see if such a situation developed.

When appellee was informed of appellant's willingness to consider any reasonable bid he wrote to her, offering on

behalf of his clients $45,000 for the property,—$5,000 in cash and $500 monthly "which would include a payment on interest and principal." The reply was not a definite acceptance nor was it a rejection, even though the offer was $10,000 less than the "asking price" and the cash payment proposed was $5,000 instead of $25,000. Despite these discrepancies the owner indicated her inclination to entertain the offer if the deed was held in escrow until one half the purchase price was paid, if the commission could be paid to the broker as deferred payments were made to her, if, because of the small down payment a statement of the financial condition of the purchasers was furnished, if the taxes and the insurance for the current year were prorated, and if no furniture was to be removed until the purchase price had been fully paid. The owner wrote that she would "have the attorney draw up a contract on the payment of two thousand dollars." When four days had passed, the appellee, in reply to this letter, advised the owner that the deposit of the deed in escrow and the proration of taxes and insurance would be satisfactory. He wrote that he would be willing to accept a small part of his commission out of the first payment on the purchase price and the remainder in reasonable amounts as deferred payments were made. There seemed to be no objection to the initial payment of $2,000, and there was no mention of the remainder of the down payment $3,000. This letter elicited a reply by telegraph: "Will go ahead with contract if your prospects have 5000 to pay down and sufficient capital to start operating. Please wire reply collect." As he was requested to do, appellee telegraphed, giving the information that he had the deposit of $2,000 and that the balance of the down payment would be made when the sale was closed.

The request in the earlier letters for a financial statement seems to have been ignored in the later ones, and the next in the series of communications which we think has a material bearing on the transaction was a letter from the owner acknowledging receipt of the telegram relative to the deposit and the remainder of the down payment. There the following significant statement appeared: "I am sure the woman [the clients] are able to go ahead with the operation of the

hotel as they would not be so foolish to pay down the five thousand if they could not begin operations as soon as possible." She stated that she would write her attorney, whom she named, to draw up the contract "as per our agreement, on the payment of the two thousand dollars to him for my account." Another statement in the letter throws considerable light on her attitude toward the ability of the purchasers to meet the deferred payments. She said she thought they would find they could pay more than the $500 a month because she had "had several hotel men say that it [the property] could be paid for in three years." This indicates to us that she had concluded the purchasers could without difficulty cause the hotel property to produce enough income to discharge the deferred payments and, therefore, that their financial responsibility had become a matter of no further concern to her. There are other statements in this letter which we think refute the assertion of the appellants that all the conditions of the sale were not met by the purchasers. As we have already pointed out, the owner of the property referred to "our agreement." The conclusion that at the time she felt she and the purchasers were in accord on the details of the transaction is emphasized by her reference to the execution of the contract which her attorney would prepare and the short time in which that might be accomplished. She wrote she was leaving New York "the latter part of next week or the first of the following week for Orlando," and then added that if the property had not been transferred by that time certain adjustments would be made with reference to a defective ceiling.

From this correspondence we get the impression that the seller thought all the terms of the sale had been agreed upon; that her attorney had all information necessary to prepare a contract; that there was a possibility, if not a probability, that the transaction could be consummated without her appearance and before her arrival in Orlando. In a final letter sent six days later than the one last mentioned she announced that she would leave for Orlando the following Tuesday morning, and said: "I will leave it up to you and [the attorney] whether you send the contract up here for my sig-

nature or hold it down there until we get there. If you do send it up please send it Air Mail." This letter, which capped the correspondence between the appellant-owner and the appellee, concluded with the following significant statements: "I will be glad to get down there and get things going, and I know the women are anxious to get this matter settled so that they can get busy on the hotel. I hope everything will move along smoothly and as quickly as possible." This manifested her satisfaction with the deal and her eagerness to consummate it as soon as possible.

Much has been said about the failure of the purchasers to furnish a financial statement, and it has been urged by the appellants that this alone was a breach of a material requirement. There is some evidence that the statement was made out and delivered to the broker, but not transmitted by him. We see no occasion to spend time discussing this element, for it is obvious to us the owner had concluded there was no need for the statement because the hotel could earn sufficient income to discharge the deferred payments as they fell due.

The correspondence ended, and the negotiations continued orally beween the appellee and the attorney of the appellant.

Just what reason there was for the failure to transfer the property is rather obscure, but the jury had a right to believe the owner became dissatisfied with some credit report about the prospective purchasers and at that late day refused to consummate the sale. We think there is ample testimony to show that every requirement insisted upon by the owner was met by the prospective purchasers and that nothing remained save the preparation by her attorney of a contract embodying the agreement which had developed by the correspondence. We believe the jury was justified in concluding that the offer of the purchasers was acceptable and that the owner abandoned the request for a financial statement. It seems clear from evidence, which the jury had a right to believe, that the $2,000 was on deposit to be paid to the appellant's attorney and that the $3,000 was on hand to complete the down payment of $5,000.

Summarizing, the appellant-owner was indefinite about listing her property with appellee. She did, nonetheless, encourage, if not invite, an offer from the persons wishing to buy, and she did entertain such offer. She set certain terms and conditions which we think were either substantially met by the buyers or waived and abandoned by her. The negotiations reached the point where she instructed her attorney to prepare a contract. She evidently felt that the sale had progressed to the point where nothing remained but to reduce the agreement to writing, and this she thought might be done even before she reached Orlando. This is evidenced by her reference to "our agreement." What happened to end the transaction before the written contract was executed is not clear, but we fail to find where the collapse of the deal was chargeable either to appellee or the prospective purchasers. We think appellee had fully performed the work which entitled him to compensation and that the appellant-owner is morally bound to pay him. But is she legally responsible? This brings us to the only remaining question, that is, the validity or invalidity of the judgment as a matter of law.

The judgment debtor at all times relevant to the transaction under study was married and, so far as the record discloses, had not been declared a free dealer. Is, then, a judgment against her valid in view of the provisions of Chapter 21932, Laws of Florida, Acts of 1943 (F.S.A. 708.08), or is that act invalid because in conflict with Section 2 of Article XI of the Constitution?

The Constitution specifically provides that the separate property of a married woman may be charged in equity and sold to satisfy debts for its purchase and its improvement. So the framers of the Constitution concentrated not only upon the particular character of the debts to which her property would be subject, but also upon the court in which liens for such debts could be adjudicated. The obvious purpose was to prevent her escaping the payment of money owed by her for the acquisition of separate property and its enhancement in value. Such circumstances would especially recommend themselves to the consideration of a court of equity, for a woman should not be allowed to enrich herself at the ex-

pense of someone else and then escape repayment of the very money which enriched her under the cloak of coverture.

By the statute, Chapter 21932, supra, the Legislature undertook to vest power in a married woman to manage and control her separate property, "contract and to be contracted with, to sue and be sued" with the freedom of a single person, but the statute contains the provision that any judgment against her shall not be a claim or lien against her right or dower in her husband's property.

Presumably, then, if the statute alone is considered, it was designed to subject the married woman's separate estate to such judgments, regardless of their nature, as might be secured against her. Liens of judgments were not confined to those imposed by decree in chancery nor restricted to claims for moneys which had been used by her to acquire or improve property.

To decide whether the statute accomplished the end intended, it is necessary to revert to the constitutional provision and its historical background that we may ascertain whether in providing that separate property could be charged in certain circumstances it was meant that it could be charged *only* in those circumstances.

As we approach a solution to the question now under consideration we observe that it is fitting to construe the Constitution "in the light of the principles of the common law." Nolan v. Moore, 81 Fla. 600, 88 So. 601. Under the common law the woman and the man became one person upon marriage, and that person was the husband. Thompson v. Thompson, 218 U. S. 611, 54 L. Ed. 1180, 31 S. Ct. 111; Blackstone's Commentaries, c. 15, page 442. This unity, or more accurately, merger, has been called the foundation for the rights, duties, and disabilities of marriage. Because of it the husband held dominion over his wife's property and she could not contract, thereby making her husband liable for any contracts she entered. First Wisconsin Nat. Bk. of Milwaukee v. Milwaukee Patent Leather Co., et al., 179 Wis. 117, 190 N. W. 822. Blackstone in his Commentaries, Chapter 15, page 445, after stating the principal legal effects of marriage observed that "even the disabilities which the wife lies under

are for the most part intended for her protection and benefit: so great a favorite is the female sex of the laws of England." Equity, however, long ago recognized the separate existence of the wife with respect to her separate estate. First Wisconsin Nat. Bk. of Milwaukee v. Milwaukee Patent Leather Co., supra, 26 Am. Jur., Husband and Wife, Page 632. To the rule at common law there evolved an exception in equity, and this development seems especially important in testing the constitutionality of the Act, Chapter 21932, under attack. Evidently the framers of the Constitution expressly recognized the exception, that is, the responsibility of the separate estate for debts augmenting that estate. Coincidentally they recognized the rule with reference to married women's disability, only to ignore it by expressly dealing with the exception. Did this have the effect of prohibiting the Legislature from passing any law to charge a married woman's property with any other claim than one for money used in acquiring or improving it? Or was it intended that the law-making body could pass no act permitting the property of a married woman to escape a debt of that character? If the first question is answered affirmatively, then Section 2 of Article XI was to be interpreted as if it had provided that *only* in such conditions should her property be reached to satisfy debt. It might be said in support of this view that had the authors intended the Legislature to have the power to make her property liable for other debts they had but to remain silent on the subject, for the Legislature had the power to pass laws affecting her disabilities unless restricted by the Constitution. Hall v. Stewart, 135 Va. 384, 116 S. E. 469. It might be argued that if it was purposed that the Legislature should retain the power to pass laws making married women's estates liable for all debts regardless of origin, why was it pointedly provided that such estates could be charged and sold for claims of a particular kind and that adjudication should be secured in a particular court?

"Our State Constitution is a limitation upon power; and unless legislation duly passed be clearly contrary to some express or implied prohibition contained therein, the courts have no authority to pronounce it invalid." Chapman v.

Reddick, 41 Fla. 120, 25 So. 673. There is no express inhibition in Article XI against passage by the Legislature of acts making married women accountable at law for debts of a kind different from those defined in the article. Any restriction must be implied on the theory that certain obligations being designated, others, by the same token, are proscribed. This reasoning would bring into play the oft quoted maxim, "Expressio unius est exclusio alterius," which should be sparingly used in construing the Constitution, or, as was written in Bryan v. State, 50 Fla. 293, 39 So. 929, "should be applied with great caution to the provisions of an organic law relating to the legislative department. . . ." There the court was dealing with a provision that the Legislature should enact laws excluding persons guilty of certain misconduct from holding public office. The court decided that the Legislature was not precluded from barring others than those named.

It would seem, then, that to mention charging a married woman's property in equity for claims of one character would not necessarily forbid a law charging it with claims of a different sort. This thought is strengthened by the lone sentence in Section 3 of the article: "The Legislature shall enact such laws as shall be necessary to carry into effect this Article."

We return now to our statement that the Legislature could remove the common law disabilities unless restricted by organic law. It does not, in our opinion, do any violence to the Constitution to conclude that the field remained open to operation by the legislative branch of the government except for the mandate that laws should be enacted to prevent the escape of married women's property from claims of the equitable qualities outlined in Section 2 of the article.

Provisions in our Constitution since statehood until the adoption of one under which we are now operating were scant in any reference to property of married women. In the Constitution of 1861, Section 21 of Article IV, there was a simple provision that "no law shall be made allowing married women or minors to contract or to manage their estates," and in the Constitution of 1865, Section 19 of Article IV, the provision

just quoted was revised to omit any reference to married women. In the Constitution of 1868, Section 26 of Article IV, it was provided: "all property . . . of the wife . . . shall be her separate property and not liable for the debts of her husband."

We think the statement of apellant is sound that from the time of statehood until 1885, with the exception of the period from 1861 to 1865, the Legislature could have, unrestrained, enacted such laws as it pleased dealing with the disabilities of femes covert.

We yield for a moment to the temptation to give briefly our observations on the general progress of the law with reference to the protection given the property of married women. We have said that Blackstone referred to "protection" and "benefit" enjoyed by married women. As civilization has advanced relaxation of the rigid common law rule with reference to the disabilities of married women has continued apace. And well it might. The strange illogic of the common law rule becomes more striking as the years pass. In this century we find women, married ones, engaged in every conceivable business and government enterprise. In the national cabinet, the national congress, and the national judiciary they have their place, and in the State and municipal governments as well. Yet if we pursue the ancient doctrine very far we arrive at a conclusion little less than absurd as far as property rights and liability for debts are concerned. We find that a woman's responsibilities and faculties remain intact from the age of maturity until she finds her mate; whereupon incompetency seizes her and she needs protection in an extreme degree. Upon the advent of widowhood she is reinvested with all her capabilities which had been dormant during her marriage—only to lose them again upon remarriage. Intermittently she is protected and benefited accordingly as she is married or single.

It seems to this writer responsibility springing from business activity complements the advantages of such enterprise and that for her to enjoy the one and escape the other is calculated to work injustice upon those with whom she deals while in her married state. Applying it to a case like the one

under consideration, she might put another person to the expense and difficulty of arranging a sale of separate property; he might expend his best efforts in good faith to negotiate the sale in accordance with her wishes; then if it suited her fancy she could refuse to cosummate the sale and blandly disclaim any liability for the sole reason that she was at the moment a feme covert.

We decide that the contract was proved and that the act under which it would be collectable is valid. The conclusion seems in harmony with the remarks of this Court in Lerch v. Barnes, 61 Fla. 672, 54 So. 763. In reaching it we have not overlooked the principle "that, where the Constitution expressly provides the manner of doing a thing, it impliedly forbids its being done in a substantially different manner" Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253. We consider it inapplicable here because it was not the primary purpose of Section 2 of Article XI to effect the adjudication in equity of all claims against married women, but to require positive action on the part of the Legislature to insure enforcement in equity against their separate property of claims having equitable qualities because they represented money traceable into the property.

Nor have we ignored the rule of construction that "Every word of a state Constitution should be given its intended meaning and effect. . . ." State v. Butler, 70 Fla. 102, 69 So. 771. We believe the statute here assailed may be declared valid without offending against any of the principles of interpretation we have adopted and in accord with another rule long since approved and announced by us. When a legislative enactment is challenged the court should be liberal in its interpretation; every doubt should be resolved in favor of the constitutionality of the law, and the law should not be held invalid unless clearly unconstitutional beyond a reasonable doubt. Holton v. State, 28 Fla. 303, 9 So. 716; Campbell v. Skinner, 53 Fla. 632, 43 So. 874.

Affirmed.

BUFORD, C. J., TERRELL, BROWN, CHAPMAN, ADAMS and SEBRING, JJ., concur.