399 So.2d 387 (1981)
DANIELI Corporation, Appellant,
v.
A. Parker BRYANT, and Robert C. Scott and Thomas A. Grier, As Co-Personal Representatives of the Estate of Robert W. Grier, Deceased, Appellees.
No. 77-2164.
District Court of Appeal of Florida, Fourth District.
May 27, 1981.
George H. Bailey of Jones & Foster, P.A., West Palm Beach, for appellant.
Coe & Broberg, Palm Beach, Cone, Owen, Wagner, Nugent, Johnson & McKeown, P.A., and Larry Klein, West Palm Beach, for appellees.

On Rehearing
BERANEK, Judge.
Defendant appeals a final judgment entered after non-jury trial which awarded plaintiff/brokers approximately $400,000 as the commission on the sale of a parcel of land. This award represented approximately a ten per cent commission on the sales price. Defendant/appellant contends that plaintiff was not the procuring cause of the *388 sale and that seller did not agree to pay a ten per cent commission. We affirm the trial court.
In the Spring of 1975, Charles Vavrus, a wealthy Illinois businessman, contacted real estate salesman, George Dempsey, regarding a tract of land listed with A. Parker Bryant, real estate broker. Dempsey worked for Bryant. At approximately the same time, Joel Martino as president of Danieli Corporation contacted Bob Grier, another broker, regarding the sale of acreage owned by Danieli. This property was encumbered by several large mortgages and a payment in excess of $1 million was due July 26, 1975.
Sometime in August, broker Dempsey, thinking of businessman, Vavrus, contacted broker Grier inquiring whether Grier knew of any good deals. Grier mentioned the Danieli property noting that the mortgages were in danger of default. Up to this point, Grier had been personally interested in purchasing the property and had not apparently obtained a formal listing agreement from Danieli.
Shortly thereafter, Dempsey informed Grier that he would produce his prospective purchaser if Grier obtained a listing agreement providing for a ten per cent commission to A. Parker Bryant, Dempsey's employer.
In late August, Grier went to Danieli to obtain a signed listing agreement and informed Joel Martino, Danieli's president, that Parker Bryant wanted a ten per cent commission. Martino stated he did not care how much commission Bryant wanted insisting only that he, Martino, wanted a net figure for the property. A draft listing of sorts was then prepared and given to Grier. Martino inserted the word "net" by the total selling price which was initially stated as $5,000,000. The listing was then amended to show a sale price of $5,500,000. The seller and broker understood broker would retain this additional $5,500,000 as a commission. The only thing actually stated in the document was that the "commission shall be added to sale price." The term of the listing was ten days. This document was delivered to Parker Bryant and signed by him.
Over the next week, there was a flurry of meetings and negotiations. The brokers showed Vavrus the property including a helicopter flight over it. Other technical information was obtained for Vavrus. Vavrus showed interest and before returning to Illinois, he indicated he would send a representative down.
Two of Vavrus' employees arrived on September 2, 1975, and were met by the brokers. This group then met with representatives of Danieli, including Joel Martino. The Vavrus' representatives said the price was too high; commissions were not discussed. The same group met the next day and Martino was firm as to price. Bryant told Martino several times that the brokers expected a ten per cent commission. Martino replied he did not care as long as Danieli got its net figure or $5,000,000. Two days later, on September 5, the group again met and the Vavrus representatives offered $4,706,583, with certain other conditions. The Danieli representatives rejected the offer.
About a week or so after this meeting, Bryant called Danieli to determine whether the brokers still had a listing on the property though the ten-day period in the written listing had actually expired on September 4. Bryant was informed he still had a listing and to continue working on the sale.
There were no further meetings between the brokers and Vavrus although Bryant's office did call Vavrus six times between the September 2 meeting and December 1. They were trying to interest him in other properties and there was testimony at trial that the Danieli property was mentioned. The Vavrus representatives indicated they were waiting for Martino to come down having made an offer.
Bryant also called Danieli several times after the meeting and Martino indicated he was waiting for Vavrus to increase his offer. There was some direct contact between Danieli and Vavrus by phone in September and a call from Martino to Vavrus in early October. In the latter call Martino *389 made several concessions which did not satisfy Vavrus.
On October 3 a suit to foreclose the mortgages on the Danieli property was filed. At this point Danieli decided, allegedly for tax reasons, that it must get rid of the property by the end of the year. Danieli made several unsuccessful attempts to get rid of the property and finally offered it to Vavrus at slightly under $4,000,000 or approximately $700,000 less than Vavrus' offer of September 5. Vavrus, not surprisingly, agreed and a closing took place on December 19, 1975.
Grier and Bryant demanded a commission on the above sale and subsequently filed suit. The complaint alleged that Bryant had a written listing from Danieli thereby obligating Danieli to pay the customary fee of ten per cent. After expiration of the written listing, it was alleged the brokers brought buyer and seller together and were responsible for the sale.
The trial court found that Danieli knew a ten per cent commission was customary and that plaintiff brokers were entitled to a ten per cent commission based on the implied terms of an oral contract made with sellers shortly after September 5, 1975. This oral contract arises from Danieli's statement to Bryant that they still had a listing and could keep working towards a sale.
Danieli appeals arguing that the brokers were not the procuring cause of the sale and that Danieli did not agree to pay a ten per cent commission.
First of all, we agree, with the statement found at Annot. 46 A.L.R.2d 852:
The general proposition is well established that if property is placed in the hands of a broker for sale at a certain price, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who, in order to make a sale, accepts a price less than that stipulated to the broker. The law will not allow the owner of property sold to reap the fruits of the broker's labor and then deny him his just reward.
As stated by the Florida Supreme Court in Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 878 (Fla. 1944), and reaffirmed in Estes v. Moylan, 94 So.2d 362 (Fla. 1957):
If the broker has brought the parties together and a sale is effected as a result of continuous negotiations inaugurated by him, he will not be defeated in his effort to recover compensation simply because of a variation between the original terms stated by the owner and those finally accepted.
Although the trial court made no specific findings of continuing negotiations or that broker was the procuring cause, these are implicit in the judgment and we find sufficient evidence in the record to support both.
This appeal would be an obvious affirmance if the suit below had been one specifying quantum meruit as the theory of recovery. The broker would clearly be entitled to a commission representing the reasonable value of his services and there was adequate evidence that a ten per cent commission was reasonable. Although the trial court's ruling was based on implied contract rather than quantum meruit, we conclude the distinctions between these theories of recovery are not crucial in this case.
Appellant argues the record demonstrated the seller, Martino, was adamant in his position that brokers would receive a commission of anything above a $5,000,000 net to the seller. We must, however, conclude that Martino abandoned this position when he told the brokers to keep working towards a sale and then suddenly sold the property to Vavrus at a price $700,000 less than the offer which Bryant and Grier had obtained. In so doing, it seems clear Martino frustrated the brokers' chances of making a commission even under the $5 million net scheme. They had an opening bid of $4.7 million on a $5.5 million opening offer and could with concessions from the seller have possibly upped buyers' offer beyond the opening bid. There can be little argument that Martino's insistence on $5 million net was totally abandoned when he sold for $4 million.
This case is unlike Foley-Carter Insurance Company v. Commonwealth Life Insurance *390 Company, 128 F.2d 718 (5th Cir.1942), where a sale by owner at $215,000 to purchaser to which broker had offered the property at $350,000 did not support the conclusion that broker was the procuring cause. Here, buyer first made an offer which seller subsequently undercut. We frankly admit that this case does not clearly come within any of the precedents nor do any of the standard theories seem applicable. We have found no reported decision where a broker produces a purchaser and an offer close to the demand only to sit by and watch while the seller drastically reduces his demand below the offer in direct dealing with the same buyer. Selling property at a price substantially below what a purchaser offers is abnormal business. Here the trial court, having seen the witnesses and heard their testimony, found an implied agreement to pay a ten per cent commission which was the reasonable value of the brokers' services under these rather strange circumstances. This conclusion is to be presumed correct on review before this court.
The only documentary evidence[1] (the listing agreement) is consistent with this because it provided a $500,000 commission on a $5,000,000 net to the seller.
Having waived or abandoned the initial terms calling for a $5.5 million sale and $5 million net, the seller was obligated for a reasonable commission when he sold to a purchaser procured by Bryant and Grier. There was evidence that seller knew a ten per cent commission was customary and he impliedly agreed to so compensate the brokers. We affirm the trial court in this regard. Appellant raises several other points on appeal which we do not believe have merit.
AFFIRMED.
ANSTEAD, J., concurs.
SIMONS, STUART M., Associate Judge, dissents with opinion.
SIMONS, STUART M., Associate Judge, dissenting:
I respectfully dissent. On the basis of the facts the trial court found that an implied brokerage contract existed between the owner and the broker and that there was an implied term within this contract to pay a 10% commission on the gross sales price of the property. The court found the gross sales price to be approximately *391 $4,000,000 and awarded a brokerage commission in the approximate amount of $400,000. The trial court's judgment specifically found the 10% was an implied term of an oral agreement between the parties.
The crucial issue is the sufficiency of the evidence to support the finding of a 10% commission based upon an oral agreement between the parties. It is clear that prior to the phone call in which an "open listing" was discussed, the seller would not agree to a 10% commission despite the fact that both seller and broker knew broker wanted such commission. The original written listing did not state the commission to be 10%. The contract was effective for only ten days during which time the seller was to receive a $5,000,000 net figure. If the broker could secure a buyer at the price of $5,500,000, he would in fact have made his 10% commission. It is this key element of the eventual implied contract for which I find insufficient support in the evidence. The parties had not agreed to a 10% commission in the negotiated written contract. I believe the trial court erred in finding such a term by implication based solely on the phone conversation in which the parties discussed an "open listing." In short, if the seller did not agree to pay a 10% commission in the written contract, then such a commission should not have been implied after expiration of the written contract. At most, under the circumstances here, the implied terms might have been equal to the written contract but not substantially superior to it.
Appellee argues that 10% commissions are customary. There is adequate evidence supporting the plaintiff's contention that the defendant/seller was aware that brokers customarily receive 10% commissions in such sales. However, I find no evidence to support anything beyond mere knowledge on seller's part. There is simply nothing in the record to support a finding that seller ever expressly or impliedly agreed to this 10% commission even though it may well have been the custom.
This case was not a suit to recover on a theory of the reasonable value of the services rendered. The pleadings and the briefs do not assert any cause of action based on quantum meruit. This was clearly a suit for breach of contract and the trial court so held by finding a specific oral contract. In situations involving quantum meruit, the law would imply that the broker be compensated for the reasonable value of his services. However, the plaintiff did not sue on this theory, the issue was not tried by consent and the defenses to such a cause of action are different in an action based on quantum meruit. The court below did not award a judgment based upon reasonable value of the broker's services but instead did so on the basis of an oral contract with an implied term for a 10% commission. Clearly, a party cannot recover on the inconsistent theories of breach of contract and quantum meruit. Proof of an express agreement defeats rather than sustains an action based on quantum meruit. Solutec Corp. v. Young & Lawrence Associates, Inc., 243 So.2d 605 (Fla. 4th DCA 1971), and Tobin and Tobin Insurance Agency, Inc. v. Zeskind, 315 So.2d 518 (Fla. 3d DCA 1975). Here, plaintiff proved at most the continued existence of the contract originally agreed upon. This prevents recovery on a quantum meruit.
I would reverse the judgment herein.
NOTES
[1] The written listing provided as follows:

 OFFER
 PROJECT 5000
 PROPERTY DATA:
 Total Acreage 4,744.464 acres
 Selling Price for Parcel 1 & 2 $2,500,000
 Selling Price for Parcel 3 & 4 $2,500,000 3,000,000
 Total Selling Price (Net) $5,000,000
 Average Selling Price Per Acre $1,047.24
 NOTE AND MORTGAGE DATA:
 One note and mortgage for
 each parcel in the amount of $ 954,893.00
 Total Notes and mortgages 3,819,572.00
 Terms of Mortgage:

1. Interest payable at 7.5% semi-annually on July 26 and January 26 of each year on outstanding principal.
2. Principal payable on July 26, 1975 on each note in the amount of $238,723.25, for a total principal payment of $954,893 annually and each year thereafter until paid in full (1978).
Terms of Sales:
1. Assume existing mortgage plus interest from July 26, 1975, plus accrued taxes for 1975. (Taxes paid 1974  $32,744.10)
2. $100,000 earnest money deposited at time of contract to be applied at closing to purchase price (adjusted pro rata by parcel purchased)
3. $1,180,428 at closing (adjusted by earnest money deposit).
4. Commission shall be added to sales price.
5. Offering shall be subject to terms and conditions of mortgage.
6. Offering shall terminate ten days from this date on upon notice of mortgageholders to exercise option to accelerate mortgage, whichever is sooner.
7. Property shall be taken subject to existing options for purchase of two each one hundred acre tracts (plus or minus) located in section 14, more specifically described in the attached legal description.
8. Seller assumes no liability of any nature whatsoever should an agreement be entered into and not closed due to the terms and conditions of the existing mortgage.
The terms and condition of this offering are accepted this 25th day of August, 1975.
 /s/ A. Parker Bryant 
 Parker Bryant