[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 332 
Architectura, Inc., appeals from a judgment of the Jefferson County Circuit Court, entered after an ore tenus proceeding, in favor of Tom Miller and Diane Miller on Architectura's claims against the Millers seeking payment of $22,258.64, plus interest and costs, arising from Architectura's performance of architectural services. We affirm.
 Standard of Review
Because the trial judge heard the evidence without a jury, our standard of review accords a presumption of correctness as to both the trial court's factual findings and its judgment based upon those findings:
 "We note that under the ore tenus standard of review, the trial court's findings of fact based on oral testimony, and a judgment based on those findings, are given a presumption of correctness. A judgment based on such findings will not be reversed unless it is shown to be plainly and palpably wrong. The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony."
Ex parte Pielach, 681 So.2d 154, 154-55 (Ala. 1996) (citations omitted).
Moreover, we note that the trial court's judgment contains no specific findings of fact. Under these circumstances, our review is governed by the following additional principles:
 "Because the trial judge made no specific findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment. Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless found to be plainly and palpably wrong. The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment."
TransAmerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375,378 (Ala. 1992) (citations and internal quotation marks omitted). Finally, we note that "[i]n ore tenus proceedings the trial court is the sole judge of the facts and of the credibility of witnesses," and "we are required to review the evidence in a light most favorable to the prevailing part[ies]," that is, the Millers. Driver v. Hice, 618 So.2d 129,131 (Ala.Civ.App. 1993); see also First Health, Inc. v. Blanton,585 So.2d 1331, 1332 (Ala. 1991) (reviewing evidence in the light most favorable to the prevailing party where the trial court's judgment was entered after an ore tenus proceeding).
 Facts
In August 1995, the Millers decided to build a new home in Liberty Park, an area near Birmingham, when they became aware that a lot was available in that area. They dealt with a real estate development *Page 333 
company called Joint Venture, Inc. ("JVI"), which was developing lots in that area near the ninth hole of a nearby golf course. With respect to Liberty Park, JVI had entered into pre-existing agreements with particular architects and contractors that would be "assigned" to each of seven particular unimproved lots, a type of arrangement that JVI had apparently not tried in the past. One of these architects was Randy Marks, the principal of Architectura.
At trial, Tom Miller testified that Jim Head, a salesperson with JVI, had told him that Lot 7-A, which the Millers would eventually purchase, had been assigned to Marks, and that the Millers would be responsible, at the closing of the sales transaction concerning the lot, for paying a fee of $25,000 for "architectural services." Tom Miller further testified that it was his understanding that that fee was to be paid for Marks to serve as the Millers' architect, and that there was no agreement between Marks and the Millers regarding the services he was to provide with respect to Lot 7-A and the subsequent construction of a house on that lot. Diane Miller testified that no one at JVI or with Architectura provided any description, oral or written, of what "architectural services" Marks would be bound to provide under the pre-existing agreement between JVI and Marks. Finally, Marks testified that he had not seen any written agreement concerning what his duties were to be regarding the Millers' house, and admitted that he never had a written contract with the Millers, but only a letter agreement with JVI.
Pursuant to his agreement with JVI, Marks had provided two separate house designs to JVI that did not include schedules or specifications. The Millers, however, informed Marks that they wanted a brick house built in the "Georgian" style, and they met with Marks and others connected with Architectura on several occasions between the fall of 1995 and June 1996, when the Millers closed their purchase of the lot. At closing, Diane Miller tendered a check for $25,000, and the closing attorney in turn issued a check for $25,000 to Marks that bore the notation "For: Architect Fee"; Marks testified that he later received the attorney's check. Tom Miller testified at trial that he believed that Diane Miller's $25,000 payment represented payment for Marks's architectural services as needed "from soup to nuts," i.e., from initial planning to final construction of their home, and Diane Miller testified to having had a similar belief.
Marks prepared house plans to the Millers' specifications and delivered them to the Millers just before groundbreaking in July 1996. Construction of the house had originally been assigned by JVI to The Burman Brothers, a general contractor; however, that firm's option had expired by the time of closing, and the Millers elected to use John Reamer Construction, who proposed to construct the Millers' home for less money. Between July 1996 and January 1997, the first phase of construction of the Millers' home, Marks and other Architectura personnel visited Lot 7-A to view the construction work, and no billing statement was sent by Architectura to the Millers regarding those visits.
In March 1997, an Architectura representative noticed flaws in the home's construction and telephoned Marks, who visited the lot himself and telephoned Tom Miller to inform the Millers of the flaws he had discovered. Tom Miller subsequently requested Marks, who, in Tom Miller's words, was part of their "architectural team," to review some of the flaws in the home's construction. Marks testified that he met in person with Tom Miller and that Tom Miller had orally agreed, during that meeting, to be billed by the hour for Architectura's services. However, Tom Miller testified that he had engaged an engineer to inspect the construction site, and that Marks had thereafter requested Miller to "put in writing the things we had discussed because he was up in Montana and wouldn't let Bill [Cash, an Architectura *Page 334 
employee] do anything." Tom Miller further denied having had any oral agreements with Marks at all. The record contains a letter to Marks dated April 2, 1997, in which Tom Miller requested certain help "on an expedited basis from [Marks] and [Cash] as our architectural team" and referred to Marks's being on vacation in Montana at the time.
In November 1997, after Marks and others at Architectura had performed certain corrective work with respect to the steel, brick, and wood construction of the Miller's home, Architectura sent the Millers a bill for $22,485.94, listing various items of services performed between January and November 1997. According to the Millers' testimony, that bill was the first indication that Architectura intended to charge them up to $90 per hour for architectural services, or that the fee of $25,000 that they had paid at closing would not cover all architectural services to be rendered in connection with the home. The Millers declined to pay that bill or Architectura's later revised bill, and Architectura recorded a lien against Lot 7-A in the amount of $22,258.64, the revised bill amount.
 Issues
Architectura's issues on appeal mirror its claims in the trial court. It contends that the trial court's judgment in favor of the Millers is erroneous because, it says, it proved its entitlement to payment based upon an implied-in-fact contract theory and an unjust-enrichment theory. The Millers, for their part, emphasize the legal presumptions in favor of the trial court's judgment, and dispute Architectura's right to recover on either theory.
 I. Implied-in-Fact Contract Claim
Architectura's primary contention is that the conduct of the parties requires a finding that the Millers implicitly agreed to pay Architectura by the hour for its services rendered during and after March 1997. However, Architectura's implied-in-fact contract theory suffers from several flaws, most notably that proof of an implied-in-fact contract requires proof of the same elements that proof of an express contract requires. See Steiger v. Huntsville City Bd. of Educ., 653 So.2d 975,978 (Ala. 1995). "No contract is formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract."Id.
In this case, the Millers adduced evidence (1) that they had already paid an "architect's fee" of $25,000 at the time of closing in June 1996 and that Architectura had received that payment, (2) that the parties entered into no further oral agreements after that payment, (3) that no one at JVI or Architectura had informed them precisely what services the Millers would receive for the $25,000 fee, and (4) that Tom Miller had requested Architectura's assistance in addressing construction defects in 1997 because the Millers had believed that the $25,000 payment was a comprehensive fee for all services to be performed in connection with their home. On the other hand, Marks testified that under his letter agreement with JVI, the $25,000 payment was solely for providing preliminary house plans, and Marks stated that he and Tom Miller had had an oral understanding in March 1997 that he would bill the Millers by the hour for his services.
A reasonable inference that could be drawn by the trial court from the conflict in the parties' testimony (and as to which we must defer underPielach, supra) is that mutual assent to an essential term of the "contract" pleaded by Architectura (i.e., whether the Millers would have to pay Architectura more than the $25,000 they had already paid) was not present. However, even if that conflict did not alone demonstrate lack of mutual assent, the trial court could properly have found for the Millers on the implied-in-fact contract claim by crediting the Millers' unequivocal testimony that no contract to pay Architectura by the hour existed, and disbelieving Marks's testimony to the contrary. "Where, as here, the evidence is presented *Page 335 
orally [and] . . . is in dispute, the trial court is free to choose which evidence it believes and is responsible for solving any conflicts."H.A.S. v. C.S., 681 So.2d 588, 589 (Ala.Civ.App. 1996). Especially in light of our duty to review the record in a light most favorable to the Millers (Driver and First Health, supra), we decline Architectura's invitation to reverse the judgment of the trial court on the implied-in-fact contract claim.
 II. Unjust Enrichment Claim
Architectura's second issue concerns whether it is entitled to recover for work and labor performed for the Millers under an unjust-enrichment rationale, i.e., in quasi-contract. Alabama law has long recognized unjust enrichment as a basis for an award of compensation for services: "`Where, in the absence of an express contract, valuable services are rendered by one person to another, which are knowingly accepted, the law will presume an obligation to pay therefor what such services are reasonably worth, unless there is some other circumstance to rebut the presumption.'" Tyson Arrington v. Thompson, 195 Ala. 230, 233, 70 So. 649,651 (1915) (quoting Hood v. League, 102 Ala. 228, 230, 14 So. 572, 572
(1894)). Even when a defendant has knowledge both of a plaintiff's performance of services and of that plaintiff's belief that that performance was pursuant to a valid contract, however, "there may be circumstances in which [the defendant] could reasonably believe that no compensation was expected of him." 3 George E. Palmer, The Law ofRestitution, § 14.15(c) (1978).
It is undisputed that the Millers both sought and accepted Architectura's services, both during and after closing. However, in this case, there was evidence that would support a finding that the legal presumption of an obligation to pay for Architectura's services was rebutted. As we have stated, while Marks's testimony indicates a belief that the Millers would pay Architectura by the hour for services rendered during 1997, there was substantial evidence tending to show that Tom Miller requested services from Architectura after closing under the belief that his wife had already paid for those services at closing.
We note that "[r]estitution for services rendered under mistake is not permitted as freely as for money paid or things given," and "where services are rendered to another without intent or agreement by the other party to pay for them, the hardship to the person called upon to pay for the services ordinarily is sufficient to prevent restitution because of mistake." 66 Am. Jur. 2d Restitution Implied Contracts, § 27 (1973). Section 41 of the Restatement of the Law of Restitution,Quasi-Contracts and Constructive Trusts provides the applicable black-letter principle:
 "A person who has rendered services to another or services which have inured to another's benefit, is not entitled to compensation therefor if the services were rendered:
 "(a) without the other's knowledge or reason to know of them, solely because of a mistaken belief
". . . .
 "(iii) that the other or a third person had contracted to pay therefor or that a duty by the other would result therefrom, or that by performance he would acquire an interest in the thing benefited by the service; or
". . . .
 "(b) with the other's knowledge, solely because of one of the mistaken beliefs stated in Clause (a), where the other had no reason to know of the mistake or that he was expected to pay therefor and had made no manifestation of a promise to pay."
Accord, Dancy v. Baker, 206 Ala. 236, 89 So. 590 (1921) (denying quasi-contractual recovery to a real-estate broker, although the broker had induced a prospective purchaser to again inspect the vendor's land, where the vendor had no reason to know *Page 336 
at the time of sale that the broker had sent the prospective purchaser to him).
Marks's testimony in this case indicates that Architectura performed services for the Millers in addition to providing house plans under the belief that the Millers would pay a fee of up to $90 per hour. Of course, the Millers knew that Architectura was providing services for them after closing, having requested those services on the basis that Architectura's personnel were part of their "architectural team." Nevertheless, the trial court could have concluded from the Millers' testimony that they (a) had no reason to believe in April 1997, the date of Tom Miller's letter requesting Architectura's assistance, that they were incurring an obligation to pay additional sums to Architectura above and beyond the $25,000 they had already paid, and (b) made no statements indicating that they would pay additional sums. Under the principles enunciated in Section 41(b) of the Restatement, supra, the trial court was not compelled to award Architectura the reasonable value of services performed on behalf of the Millers after closing.
 Conclusion
After reviewing the record in light of the applicable standards of appellate review, and the prevailing substantive legal principles, we conclude that the trial court's judgment in favor of the Millers is not plainly and palpably wrong. Pielach and TransAmerica, supra. The judgment is therefore due to be affirmed.
AFFIRMED.
Yates, Monroe, Crawley, and Thompson, JJ. concur.