863 So.2d 334 (2003)
ACT REALTY, CO., INC., Appellant,
v.
ROTEMI REALTY, INC., et al., Appellees.
No. 3D02-1707.
District Court of Appeal of Florida, Third District.
August 20, 2003.
Rehearing and Rehearing Denied January 16, 2004.
*335 Craig J. Trocino, Miami, for appellant.
Sheldon R. Rosenthal, Miami, for appellees.
Melinda L. McNichols, for the School Board of Miami-Dade County as amicus curiae.
Before COPE and LEVY, JJ., and NESBITT, Senior Judge.
Rehearing and Rehearing En Banc Denied January 16, 2004.
LEVY, Judge.
"What are you going to believe ....what you see with your own eyes or what I tell you?"[1]
Although the parties in this case say that the contract and events that form the basis of this case are just part of a routine real estate transaction, anyone who reads the Record in this case, including the contract at issue and the transcript of the proceedings below, will quickly realize that what took place here is violative of, and repugnant to, the public policy of this State which, in the final analysis, seeks to promote and protect the integrity of government *336 and, ultimately, the best interests of the public at large.
Appellant, ACT Realty Co. ("ACT Realty"), appeals from a Final Judgment in favor of Appellees/Brokers Rotemi Realty, Inc. and Martin-Hidalgo & Associates Realty, Inc. ("the brokers") in which the trial court concluded that the brokers were the procuring cause of a sale of property to the Miami-Dade County School Board ("School Board"), thereby entitling the brokers to a commission on the sale. We reverse and remand to the trial court with instructions.
ACT Realty owned a 10-acre parcel of property that was surrounded by a 50-acre parcel of property controlled by Michael Cease. On January 21, 1999, ACT Realty entered into a Commission Agreement with the brokers. In this agreement, ACT Realty agreed to pay a real estate brokerage commission to the brokers on the sale of the 10-acre parcel. According to the Commission Agreement, the agreement would be valid only if the brokers were "able to procure a sale with the school board of Dade County Florida as the buyer." The Commission Agreement further provided that "[t]he amount of the commission will be equal to the amount of the sale proceeds due [to ACT Realty] at closing that is over $1,000,000." On August 25, 1999, the School Board and ACT Realty entered into a contract for the purchase of the 10-acre parcel. The selling price for the 10 acres was $1,164,650.50. After the School Board and ACT Realty completed the sale, $164,650.50 remained in the trust account of the escrow agent. Although the commission to the brokers was to be $164,650.50 under the terms of the Commission Agreement, the Record reflects some arrangement wherein $20,000.00 was withdrawn from the escrow account for the purposes of paying a fee to a lobbyist hired to facilitate the sale. After the sale, a dispute arose as to whether the brokers were entitled to a commission on the sale of the property. Francis X. Santana, the escrow agent, initiated this interpleader action for the purpose of obtaining a judicial determination of which party was entitled to receive the remaining escrow funds in the amount of $144,650.50. ACT Realty and the brokers filed cross-complaints and a trial was conducted.
At trial, ACT Realty contended that the brokers were not entitled to a commission because they had little to do with the sale ultimately occurring. Specifically, ACT Realty argued that (1) the School Board decided to purchase the property before the brokers became involved in the transaction, (2) the brokers learned of the School Board's interest in the property when they observed certain materials at the School Board's office, and (3) the transaction was concluded as a result of the efforts of Cease and Melton. The trial court entered a Final Judgment in favor of the brokers, concluding that they were the procuring cause of the sale of the property. This appeal follows.
We conclude, on the authority of this Court's well-reasoned opinion in City of Hialeah Gardens v. John L. Adams & Co., Inc., 599 So.2d 1322, 1323-24 (Fla. 3d DCA); rev. denied, 613 So.2d 5 (Fla.1992), that the Commission Agreement entered into between ACT Realty and the brokers is void and unenforceable because contracts which provide for contingency awards for securing public monies are against public policy. In City of Hialeah Gardens, we explained that contracts which provide for contingency awards for securing public monies, among other things, have been found to be void as against public policy because such agreements "suggest the use of sinister and corrupt means for the accomplishment of the ends desired." City of Hialeah Gardens, *337 599 So.2d at 1323 (quoting Wechsler v. Novak, 157 Fla. 703, 26 So.2d 884, 885 (1946)). We went on to explain that there is a legitimate public policy concern that contingent fee arrangements promote the temptation to use improper means to gain success. See City of Hialeah Gardens, 599 So.2d at 1324.
The test applied by courts to determine whether a contract offends public policy is whether "the contract has a tendency toward such an evil." City of Hialeah Gardens, 599 So.2d at 1323. Moreover,
the test to be applied is not what is actually done but that which may or might be done under the terms of the contract; it is the evil tendency of the contract and not its actual injury to the public that is determinative, as the law looks to its general tendency and closes the door to temptation by refusing to recognize such agreements.
City of Hialeah Gardens, 599 So.2d at 1323-24. As previously stated, the Commission Agreement provided that, assuming the brokers procured a sale of the property to the School Board, "[t]he amount of the commission will be equal to the amount of the sale proceeds due [to ACT Realty] at closing that is over $1,000,000." In other words, ACT Realty sought a price of $1,000,000 for its property, with the brokers' commission to be contingent on the degree of success the brokers had in obtaining a price higher than $1,000,000. Without examining what actually transpired following the signing of the Commission Agreement, this agreement undoubtedly created a situation in which there was a possibility for the use of "sinister and corrupt means" in order (1) to influence the School Board to purchase this particular property from ACT Realty, and (2) for the brokers to earn the highest possible commission by obtaining as high a price as possible, over and above $1,000,000, from the School Board. Thus, there is little doubt that we are required to conclude that the Commission Agreement involved in the instant case is void and unenforceable for public policy reasons. Moreover, given that the Commission Agreement is void for public policy reasons, we also conclude that the escrow agent should be directed to return the amount currently in escrow$144,650.50to the School Board.[2] Clearly, these funds should not be remitted to ACT Realty because doing so would undoubtedly allow ACT Realty to benefit via a windfall from the illegal contract it entered into.
With regard to the contention that the real estate broker is entitled to a commission based on quantum meruit, we note that the decisions relied upon by the real estate broker did not involve contracts which were void for reasons of public policy and did not involve sales to governmental entities. Here, by contrast, there was a non-customary seller/broker arrangement targeted to a specific governmental buyer and calling for a commission of all funds received in excess of $1 million. The strong public policy which invalidates the parties' contract also precludes recovery *338 on the basis of quantum meruit. As we stated with regard to a real estate commission in Bradley v. Banks, 260 So.2d 256, 257 (Fla. 3d DCA 1972): "The contract being void as a matter of public policy, the services rendered in connection therewith cannot be made the basis for a quantum meruit claim ..." See also Vista Designs, Inc. v. Silverman, 774 So.2d 884, 888 (Fla. 4th DCA 2001).
Accordingly, we remand to the trial court to direct the escrow agent to return the escrowed funds to the School Board.
Reversed and remanded.
NESBITT, Senior Judge, concurs.
COPE, J. (dissenting).
The majority opinion is contrary to a controlling decision of the Florida Supreme Court, Robert & Co. v. Mortland, 160 Fla. 125, 33 So.2d 732 (1948).
In the present case the real estate brokers obtained a listing from the property owner under which they would earn a commission if they procured a sale of the 10-acre tract to the Miami-Dade County School District. The School District bought the property. The owner then refused to pay the agreed commission, contending that the brokers had not been the procuring cause of the sale.
There was a bench trial in which the trial court ruled that the brokers had earned their commission. There was no claim that the brokers ever lobbied the School Board members, obtained the contract by favors, or used corrupt means.
On this appeal, the majority has on its own motion concluded that a real estate commission agreement is void where the real estate commission is contingent on procuring a sale to a public body. The majority has decided to make a gift of the real estate commission to the School District.
The majority opinion never cites Robert & Co v. Mortland, nor does the majority explain how it avoids the rule stated in that case, which is:
We understand the general rule to be that an employment in which compensation is contingent on success in securing contracts from public officials is not illegal on its face. It must be shown that it was induced by favors or corrupt means. The record in this case is devoid of any showing that plaintiff had any personal or political influence or that the contract was induced by illegal influence.
Robert & Co., 33 So.2d at 734 (emphasis added; citations omitted).

I.
This case comes to us on appeal from a final judgment entered after a bench trial. It is therefore essential to review the evidence pertaining to the commission agreement.
Maria Martin-Hidalgo is a real estate broker (and architect) with her own company, Martin-Hidalgo Realty. She had a listing for an unrelated tract of 20 acres in the western part of Miami-Dade County. She made an appointment with Leon Valentine, director of the real estate department of the Miami-Dade County School District, to determine whether the School Board might have an interest in the 20 acres. This was the first time Ms. Martin-Hidalgo ever met Valentine.
In their meeting, Mr. Valentine explained that 20 acres is too small for a school site. Because of overcrowding in existing high schools, the School District was looking for a site for a new high school. However, the recommended minimum size for a high school was 40 acres. Thus, the School District would have no *339 interest in the 20-acre site Ms. Martin-Hidalgo was representing.
While in the office Ms. Martin-Hidalgo looked at a wall map, which had certain tracts of land marked in yellow highlighter. One of these was a U-shaped site consisting of 50 acres. In response to her question, Mr. Valentine said that the School District was interested in the 50-acre site.
Ms. Martin-Hidalgo asked about the 10-acre tract in the center of the "U"the hole in the doughnut or more correctly, the hole in half-a-doughnut. According to Ms. Martin-Hidalgo's trial testimony, Mr. Valentine responded that it would be nice to have the 10 acres, but it was not essential because the 50-acre tract would give the School District sufficient land for a new high school.
Ms. Martin-Hidalgo decided to investigate the 10-acre tract further, in hopes that she could obtain a listing and persuade the School Board to acquire the 10 acres along with the 50. She called Jose Perez-Urrutia, of Rotemi Realty, a broker with twenty-seven years experience who was very knowledgeable about land in that area.
Mr. Perez-Urrutia was familiar with the 10-acre tract and the 50-acre tract. The 50-acre tract was controlled by Michael Cease. The 10-acre tract was owned by David Moliver through his company, Act Realty Co. Moliver had placed a "for sale" sign on the 10-acre tract. Mr. Perez-Urrutia knew Cease and Moliver.[3]
Perez-Urrutia and Martin-Hidalgo met with Moliver. The brokers explained that the School District was considering the acquisition of Cease's 50 acres. They offered to represent Moliver in an effort to convince the School District to buy the 10 acres along with Cease's 50 acres. This would give the School District a rectangular tract which would be easier to work with than the U-shaped 50-acre tract.
Moliver agreed. He told the brokers that he wanted $1 million for his 10 acres. He proposed that the brokers keep anything over $1 million as their commission. The brokers testified that they agreed to this because they believed that the School District would wind up paying Cease over $100,000 per acre for his 50 acres. They reasoned that if the School District bought Moliver's 10 acres in addition, it would be at the same price. They thus concluded that they had reasonable prospects for earning a commission under the arrangement that Moliver proposed.
Moliver then personally typed the Commission Agreement which states:

Commission Agreement
This agreement is between ACT Realty (owner) and Martin-Hidalgo & Associates and Rotemi Realty (brokers).
The owner agrees to pay a real estate brokerage commission to the brokers on the sale of the property described as:
Tract 3, Miami Everglades Land Co., section 29, township 54 south, range 30 east, PB 2, Pg 3 of the public records of Dade County.
This commission agreement is only valid if the brokers are able to procure a sale with the school board of Dade County Florida as the buyer.
The amount of the commission will be equal to the amount of the sales proceeds due the owner at closing that is over $1,000,000. *340 This commission agreement is valid for a period of ninety days from the date of execution below. If there is no signed contract between ACT Realty and the school board of Dade County after ninety days, this agreement becomes null and void.
/s/ ________
ACT Realty
/s/_________
Martin-Hidalgo & Ass.
/s/_________
Rotemi Realty
R. 131.[4] It was agreed that the listing price would be $1.2 million.
Mr. Moliver next typed a letter authorizing the brokers to represent Act Realty on this proposed sale and faxed it immediately to the School District.[5]
The following month, Moliver entered into the identical nonexclusive arrangement with Perez-Urrutia, to sell the 10 acres to Lennar Homes. Once again, the commission to be paid to the broker was the excess over $1 million in the event of a sale to Lennar.[6]
Soon after this, Leon Valentine left the School Board staff. The brokers pursued the matter with other staff members.
In June 1999, Kathryn Wilbur wrote to Ms. Martin-Hidalgo to offer $800,000 for the 10 acres. Ms. Wilbur was at that time executive director of Governmental Affairs and Land Use Policy and Acquisition for the School District. Moliver made a counteroffer. According to the brokers' testimony, Ms. Martin-Hidalgo's responsibility was to communicate with the School District staff, while Mr. Perez-Urrutia's responsibility was to coordinate with Moliver and Cease. By Moliver's account, he and Cease became personally involved in the negotiations.
Eventually the School District agreed to buy both tracts: the 50-acre tract from Cease and the 10-acre tract from Act Realty. The School District paid the same price per acre for all of the land. The *341 price for the 10 acres was $1,164,650.[7]
The School Board approved the transaction on a 6-3 vote, which was the minimum vote necessary. After this, but before the closing, the brokers were told that Cease had retained a lobbyist, Dusty Melton, who had lobbied the School Board members in connection with this transaction.
Cease requested that Moliver pay $20,000 towards Melton's fee, reasoning that Melton's efforts had resulted in a favorable vote by the School Board members for the entire transaction. The brokers testified that this was the first time they were aware that a lobbyist was involved in this transaction. Moliver testified similarly, although Cease stated that Moliver had been aware of Melton's involvement at an earlier stage.[8]
Under Moliver's agreement with the brokers, Moliver's company (Act Realty) was to receive $1 million net at closing. This meant that a $20,000 lobbyist expense would have to be treated as an expense of the sale, and would not come out of Act's $1 million net. The $20,000 amount would come out of the funds which otherwise would have gone to the brokers.
The brokers claimed a commission of $144,650.[9] Moliver refused to pay it. He reasoned that the lobbyist, not the real estate brokers, had procured the sale. The disputed commission amount was escrowed at closing.
The escrow agent filed an interpleader action for the $144,650. Act Realty and the brokers each made claims for the money, and the trial court conducted a bench trial. Based on the evidence presented and the wording of the Commission Agreement, the trial court concluded that the brokers were entitled to their commission. The owner (Act Realty) has appealed.
On its own motion, this court directed the parties to address whether the real estate Commission Agreement in this case is void as being against public policy, under dictum contained in City of Hialeah Gardens v. John L. Adams & Co., 599 So.2d 1322 (Fla. 3d DCA 1992). The court also directed the parties to address what disposition should be made of the escrow in the event that the Commission Agreement is found to be void.

II.
It should be obvious that it is permissible for a landowner to hire a real estate broker to sell the owner's land, and to compensate the broker by a commission in the event the real estate broker procures a sale. It makes no difference whether the buyer is a public agency or a private person. There is nothing inherently illegal about such an arrangement.
The Florida Supreme Court has said:
It is quite true that if the contract with a public body is secured as a favor in exchange for personal or political influence, it is contrary to public policy and cannot be enforced. There is not the slightest showing here that the contract in question was induced by favor or reward, nor is it shown that any corrupt influence was used or that anything more than competency and square dealing induced placing the contract.

*342 Appellant relies on Wechsler v. Novak, 157 Fla. 703, 26 So.2d 884 (1946), and similar cases, but we think these cases clearly support the rule announced in the previous paragraph. We understand the general rule to be that an employment in which compensation is contingent on success in securing contracts from public officials is not illegal on its face. It must be shown that it was induced by favors or corrupt means. 46 A.L.R. 196. Edwards v. Miami Transit Co., 150 Fla. 315, 7 So.2d 440 (1942). The record in this case is devoid of any showing that plaintiff had any personal or political influence or that the contract was induced by illegal influence.
Robert & Co., 33 So.2d at 734 (emphasis added).
When this case was pending in the trial court, no one allegedmuch less proved that there were any corrupt means involved in this land sale at all. The evidence showed that the brokers had no special influence with anyone. One of Moliver's complaints was that he and Cease were more effective negotiators than the brokers.
The contract was negotiated by the brokers, Cease, and Moliver with the School District staff. The contract was then presented to the School Board itself for approval. The brokers had no contact with the School Board members whatsoever. The brokers did not even know that a lobbyist was involved at the School Board level until after the transaction had already been approved. And the lobbyist had been hired by the neighboring landownerCeasenot Moliver, and not the brokers.[10]
Under the controlling legal standard, a contract of this type can be set aside in Florida only if there is proof of improper favors or corrupt means. There has been no such proof in the trial court nor any such proof in this court. The fact that this transaction was criticized in the press is no substitute for proof in court. The majority's citation of a musicala work of fictionand footnote reference to "suspicious circumstances," majority opinion at ____ n. 1, are ironic when measured against the legal test. "Suspicious circumstances" is no substitute for proof of impermissible favors or corrupt means.

III.
The majority opinion relies primarily on dictum from City of Hialeah Gardens v. John L. Adams & Co., Inc., 599 So.2d 1322 (Fla. 3d DCA 1992), but that case is of no assistance here. To begin with, a Third District case cannot overrule a controlling decision of the Florida Supreme Court. The decision in Robert & Co., remains good law and has not been receded from by the Florida Supreme Court.
The City of Hialeah Gardens case involved a lobbying contract, not real estate commission agreement. In City of Hialeah Gardens, the City hired a lobbyist to procure an appropriation for the public roads. The lobbyist was to be paid a percentage of the appropriation obtained. However, there was never any appropriation and the contingency never occurred. Id. at 1325. The City of Hialeah Gardens' discussion of contingency agreements is dictum. Furthermore, that case did not involve a commission agreement for sale of property or goods, so any discussion which *343 could be construed as relating to sales commission agreements is likewise dictum.
The City of Hialeah Gardens case quoted extensively from the plurality opinion in Wechsler v. Novak, 157 Fla. 703, 26 So.2d 884 (1946). In 1948, however, the Florida Supreme Court announced the Robert & Co., decision, which expressly explained and limited the Wechsler opinion. The limiting language was quoted at the outset of part II of this opinion.[11]
In sum, the rule set forth in Robert & Co. is controlling and must be followed here.

IV.
The Florida rule announced in Robert & Co. is in harmony with the general rule followed in other jurisdictions. As summarized by the Williston treatise:
A person having something to sell has the right to sell it through an agent, and this right is an incident to his ownership. To declare that he may not employ an agent, upon commission, where the government is the prospective buyer, is to take away what is ordinarily one of the elements of the enjoyment of ownershipthe unrestricted right to sell. Upon this line of reasoning, commission agreements for a sale to the government have been upheld and enforced in this state where the agreement did not actively require corruption in its performance. Treated as a matter distinct in its nature from agreements to procure legislation, an agreement to compensate an agent for his successful efforts in traffic with the government has been held binding, where unfairness in the dealings or an intention to resort to corruption did not actually appear from the facts.
7 Richard A. Lord, Williston on Contracts § 16:5, at 357-58 (4th ed.1997) (footnote omitted).

V.
Under the relevant legal standard, there is no basis for holding this commission agreement void.
On the merits, there is competent substantial evidence to support the trial court's conclusion that the brokers earned their commission by procuring a sale.
The trial court judgment should be affirmed.
NOTES
[1] The above line, from the musical "Chicago", was uttered by a man, whose wife found him with two women, as he tried to explain away the rather suspicious circumstances that he found himself in.
[2] The original amount in escrow was $164,650.50 prior to the $20,000 payment to the lobbyist. We leave the decision to the School Board to determine whether to seek remuneration for this "outstanding" $20,000. This is not to suggest that the lobbyist may not be entitled to be paid a fee for lawfully rendered services. Accordingly, if the School Board were to seek, and recover, remuneration for the $20,000.00 paid to the lobbyist out of the proceeds of the sale, in excess of one million dollars, received by the landowner, then further proceedings could determine which party might be financially responsible to pay those fees.
[3] The prior year, Perez-Urrutia represented Cease when Cease attempted to buy Moliver's 10 acres. Cease had offered $850,000 and Moliver had countered at $950,000. The parties never reached agreement, but through that negotiation Mr. Perez-Urrutia knew Moliver and Cease.
[4] The parties subsequently extended the time period of the Commission Agreement.
[5] The letter of authorization stated:

ACT Realty ("Owner") authorizes Martin-Hidalgo & Associates and Rotemi Realty ("Brokers") to represent their interest in Tract 3, Section 29 with the specific client known as the Miami-Dade County School Board.
Purchase Price: $1,200,000
Mitigation on approximately 8 acres to be
paid by Buyer
Existing Zoning: RUI-M(b)
/s/_________
Act Realty
David A. Moliver, President
/s/ _________
Martin-Hidalgo & Associates Realty
Maria A. Martin-Hidalgo, Broker
/s/ __________
Rotemi Realty
Jose M. Perez-Urrutia, Broker
[6] This letter agreement stated:

Pursuant to my conversation with David, I have presented your property to the same company that Mr. Cease has offered the adjacent property to. Should a sale be consummated, then my commission would be the same as with my other listing agreement with you, except that I am the sole realtor on this Buyer.
This Buyer has shown great interest, and I am confident that an offer is going to materialize.
Please acknowledge your agreement below so that I can formally present the property to this Buyer.
The potential Buyer referred to above is Lennar Homes.
The commission to be paid is that amount that is over $1,000,000 net proceeds on the closing statement to the seller.
JOSE PEREZ-URRUTIA
Agreed:
ACT REALTY
By: /s/________
President
[7] Under School Board policy, there must be appraisals of land that is being acquired. The School District paid above the appraised value, but the record does not reveal the magnitude of the excess.
[8] Cease testified that he retained Melton in 1998 to assist him with regard to the 50 acres. Moliver and his 10 acres were not involved at that time.
[9] Purchase price of $1,164,650 minus $1,000,000 to Act Realty minus $20,000 to lobbyist = $144,650.
[10] As relates to the lobbyist, no one has suggested that there was any prohibition on retaining a lobbyist in connection with this transaction, nor has anyone suggested that there was any illegal conduct by the lobbyist. The lobbyist did not testify at trial and there is no evidence regarding the lobbyist's fee agreementwhich was a fee agreement negotiated with Ceasenot Moliver, and not the brokers.
[11] The City of Hialeah Gardens opinion cites the decision in Markon v. Unicorp American Corp., 645 F.Supp. 62 (D.D.C. 1986). 599 So.2d at 1324. The Markon case actually supports the allowing of a real estate commission in this case. In Markon, the agent was denied a commission on the renewal of a lease. Under the applicable federal regulation, only a licensed real estate agent could earn a commission, and Markon had no real estate license. 645 F.Supp. at 66. In the present case, the real estate brokers are licensed.