We consider whether the common practice of paying real estate commissions contingent on consummation of the sale violates the public policy of this state when applied to a purchase or sale by the government. In the decision we review, the Third District Court of Appeal invalidated such an arrangement, concluding that "contracts which provide for contingency awards for securing public monies are against public policy." Act Realty Co. v.Rotemi Realty, Inc., 863 So.2d 334, 336 (Fla. 3d DCA 2003) (citing City of Hialeah Gardens v. John L. Adams Co.,599 So.2d 1322 (Fla. 3d DCA), review denied, 613 So.2d 5 (Fla. 1992)). This holding expressly and directly conflicts with our decision in Robert Co. v. Mortland, 160 Fla. 125,33 So.2d 732 (1948), where we announced that as a "general rule" contingency fee contracts involving government procurement violate public policy only if shown to involve "favors or corrupt means." Id. at 734. We have jurisdiction to resolve the conflict. Art. V, § 3(b)(3), Fla. Const.; Rotemi Realty, Inc. v.Act Realty Co., 880 So.2d 1212 (Fla. 2004) (granting review). For the reasons explained below, we reaffirm the general rule we announced more than fifty years ago and apply it to real estate brokerage commissions. We hold, first, that the brokerage agreement in this case complies with Florida public policy; and second, that competent, substantial evidence supports the trial court's ruling that the brokers were a procuring cause of the sale and therefore are entitled to their commission.
 I. FACTS
Toward the end of 1998, Maria Martin-Hidalgo, a real estate broker, met with the real estate director of the Miami-Dade County School District, which was looking for property to construct a new high school. She tried to interest the director in a twenty-acre tract one of her clients owned, but he rejected it as too small. He did, however, express interest in two other properties shown on a map on his wall. The first was a U-shaped, fifty-acre tract controlled by attorney Michael Cease. Recently, Cease had informed the School District that the property was available. The second property, which Cease also had mentioned, consisted of a ten-acre tract sandwiched inside the U-shaped one. This smaller property was owned by the respondent, Act Realty. The director informed Martin-Hidalgo that, although the District could build a high school on Cease's fifty acres, it would be interested in acquiring the additional ten as well.
After meeting with the director, Martin-Hidalgo contacted another broker, Jose Perez-Urrutia of Rotemi Realty. Perez-Urrutia had previously dealt with and claimed to be "good friends" with the individuals who controlled both properties. Together these brokers, whose companies are the petitioners in this case, met with the owner of Act Realty and entered into a written brokerage agreement. The agreement provided that if the brokers procured a sale of Act Realty's property to the School District within a specified period they would receive a commission "equal to the amount of the sales proceeds due the owner at closing that is over $1,000,000." Martin-Hidalgo faxed to the School District a separate letter authorizing the brokers to negotiate the sale.
The brokers then attempted to sell the ten-acre tract to the School District. Martin-Hidalgo spoke repeatedly with the District's real estate director and also discussed the property with its appraisers. The first offer went through her. At the recommendation of the other broker, Perez-Urrutia, Act Realty conducted the remainder of the price negotiations jointly *Page 1184 
with Cease, who controlled the fifty-acre parcel. Perez-Urrutia claims that he was responsible for maintaining the relationship between the two sellers.
Even before the brokers became involved, however, the School District already had an interest in the two adjacent properties. According to Kathryn Wilbur, the School District's director of government affairs and land use policy and acquisitions, those properties represented "the only site within the area" that was suitable for a new high school. A memorandum issued by Wilbur, and later approved by the regional superintendent, stated that the School District wished to acquire Cease's fifty acres and "would also prefer that the middle 10 acres be acquired, if possible." In fact, the School District ordered an appraisal of the properties two days before the brokers approached Act Realty.
The School District eventually purchased both properties at a uniform rate per acre. The selling price for the ten-acre parcel was $1,164,650.50. Before the closing, the brokers were informed that Cease had paid a lobbyist to persuade school board members to approve the transaction. Although the brokers claimed not to have known about the lobbyist, they agreed to use $20,000 of their commission to pay the lobbyist (the lobbyist's fee, which was not contingent on a sale, is not at issue here). After subtracting the $20,000, the proceeds from the sale of Act Realty's property still exceeded the $1 million mark by $144,650.50. The brokers claimed they were entitled to this amount as a commission. Act Realty contested their claim. The escrow agent therefore filed an interpleader action. The brokers and Act Realty filed cross-complaints, and eventually the trial court conducted a non-jury trial.
At trial, Act Realty argued that the brokers were not the procuring cause of the sale and thus were not entitled to a commission. The trial court disagreed and entered judgment for the brokers. In its order, the trial court explained that the brokers "clearly established that they were the procuring cause of the sale and brought the parties together resulting in the sale of the real property." According to the court, the brokers "proved that they initiated the negotiations, took affirmative action to bring the buyer and seller together, and that the transaction was closed and they were entitled to the agreed commission."
On appeal, the Third District reversed and remanded. ActRealty Co., 863 So.2d at 338. The district court concluded that the brokerage agreement between Act Realty and the brokers was "void and unenforceable because contracts which provide for contingency awards for securing public monies are against public policy." Id. at 336 (citing Hialeah Gardens,599 So.2d at 1323-24). According to the district court, "this agreement undoubtedly created a situation in which there was a possibility for the use of `sinister and corrupt means' in order (1) to influence the School Board to purchase this particular property from Act Realty, and (2) for the brokers to earn the highest possible commission by obtaining as high a price as possible."Id. at 337 (quoting Hialeah Gardens, 599 So.2d at 1323
(quoting Wechsler v. Novak, 157 Fla. 703, 26 So.2d 884, 885
(1946))). The district court ordered that the money in escrow be returned to the School District, so as to prevent Act Realty from "benefit[ting] via a windfall from the illegal contract." Id.
at 338, 26 So.2d 884.
Judge Cope dissented. Id. at 338, 26 So.2d 884 (Cope, J., dissenting). He faulted the majority for failing to distinguishRobert Co., in which we held: "We *Page 1185 
understand the general rule to be that an employment in which compensation is contingent on success in securing contracts from public officials is not illegal on its face. It must be shown that it was induced by favors or corrupt means." 33 So.2d at 734. Judge Cope noted that at trial "no one alleged — much less proved — that there were any corrupt means involved in this land sale at all." Act Realty, 863 So.2d at 342 (Cope, J., dissenting). Thus, he argued, there was no basis for invalidating the brokerage agreement. Id. at 343.
 II. ANALYSIS
The brokers now ask us to review the district court's ruling, which expressly and directly conflicts with our decision inRobert Co.[1] Act Realty in turn asks us to review the trial court's ruling that the brokers were the procuring cause of the sale. We address each issue in turn.
 A. Was the Brokerage Agreement Legal?
The district court concluded that "contracts which provide for contingency awards for securing public monies are against public policy." Act Realty, 863 So.2d at 336 (citing HialeahGardens, 599 So.2d at 1323-24). This holding conflicts withRobert Co., where we announced that as a "general rule" such contracts violate public policy only if shown to involve "favors or corrupt means." 33 So.2d at 734. Because no showing of corruption has been made or even attempted in this case, to approve the district court's decision we would have to recede from Robert Co. We decline to do so. To the contrary, we conclude that, at least as applied to real estate brokerage agreements, which have traditionally provided for fees contingent on the consummation of a sale, the general rule applied inRobert Co. remains valid.
In Robert Co., the plaintiff agreed to assist the defendant in securing an engineering contract with the City of Tampa.33 So.2d at 732. After obtaining the contract, the defendant refused to compensate the plaintiff for services rendered. Id. at 733. The plaintiff brought suit, seeking a reasonable fee. The defendant argued that their agreement was unenforceable because (1) the engineering contract was with a public agency, and the compensation for plaintiff's services was contingent; and (2) the means used to secure the contract were personal or political and contrary to public policy. Id. We rejected this argument, noting as a "general rule . . . that an employment in which compensation is contingent on success in securing contracts from public officials is not illegal on its face. It must be shown that it was induced by favors or corrupt means." Id. at 734. Because the record in Robert Co. was "devoid of any showing that the plaintiff had any personal or political influence or that the contract was induced by *Page 1186 
illegal influence," we concluded the agreement was legal. Id.
We derived the "general rule" in Robert Co. from two earlier decisions. The first was Edwards v. Miami Transit Co.,150 Fla. 315, 7 So.2d 440 (1942), in which a transit company entered a contingency-fee contract with an individual who attempted to secure a bus franchise from the City of Miami. Id.
at 440. We refused to declare the contract facially illegal because it "conceivably could have been lawfully performed without any one engaging in any act or practice which was contrary to public morals or to the public welfare." Id. at 442. The other case was Wechsler, 26 So.2d at 884, decided two years before Robert Co. We held there that "[t]he legality of agreements to influence administrative or executive officers or departments is to be determined in each case by weighing all the elements involved and then deciding whether the agreement promotes corrupt means to accomplish an end." Id. at 887. Although Robert Co., Edwards, and Wechsler were decided more than half a century ago, they represent our most recent statements on this subject. Since then, we have neither confirmed nor questioned their general rule.
Twenty-five years after Robert Co., the Legislature enacted a law — section 287.055, Florida Statutes — that would have affected that case. Ch. 73-19, Laws of Fla. Known as the "Consultants' Competitive Negotiation Act," the statute criminalizes the payment of a contingency fee for soliciting or securing a contract with a public agency regarding architecture, engineering, landscape architecture, surveying, or mapping. See
§ 287.055(6), Fla. Stat. (2004). Because Robert Co. involved an engineering contract, one of the subjects covered by the statute, the contract in that case would be illegal today. The brokers nevertheless argue that the general rule of Robert Co. remains intact, and that the Legislature merely carved out an exception for contracts in certain particular fields. Act Realty responds that the statute expresses a more general public policy against all contingency-fee agreements for the procurement of government contracts.[2] According to Act Realty, "[t]here is no principled difference between the danger for corruption posed by the brokerage of professional services to the state for contingency commissions and the brokerage of real estate to the state on the same basis." Brief of Resp't on the Merits at 36-37.
To the contrary, we believe the difference is substantial. Real estate brokerage agreements involving single-family homes, commercial businesses, and even government property all have a long history of contingency fees. Flat-fee real estate brokerage agreements are virtually unheard of. As Judge Cope stated in dissent below,
 It should be obvious that it is permissible for a landowner to hire a real estate broker to sell the owner's land, and to compensate the broker by a commission in the event the real estate broker procures a sale. It makes no difference whether the buyer is a public agency or a private person. There is *Page 1187 
nothing inherently illegal about such an arrangement.
Act Realty, 863 So.2d at 341 (Cope, J., dissenting). Judge Cope's observations are confirmed by a well-known treatise, which summarizes the general rule followed in other jurisdictions as follows:
 A person having something to sell has the right to sell it through an agent, and this right is an incident to his ownership. To declare that he may not employ an agent, upon commission, where the government is the prospective buyer, is to take away what is ordinarily one of the elements of the enjoyment of ownership — the unrestricted right to sell. Upon this line of reasoning, commission agreements for a sale to the government have been upheld and enforced in this state where the agreement did not actively require corruption in its performance. Treated as a matter distinct in its nature from agreements to procure legislation, an agreement to compensate an agent for his successful efforts in traffic with the government has been held binding, where unfairness in the dealings or an intention to resort to corruption did not actually appear from the facts.
7 Richard A. Lord, Williston on Contracts § 16:5, at 357-58 (4th ed. 1997) (footnote omitted). The repercussions for the real estate sales industry from a holding that such contracts suddenly violate public policy as applied to purchases (and, by extension, sales) by government agencies would be unpredictable.
Regardless of the differences between real estate brokerage agreements and those mentioned in section 287.055, the fact remains that the Legislature limited the scope of that statute and, for whatever reason, chose not to include real estate brokerage (and a great many other types of contracts) within its coverage. We have generally recognized the principle of statutory construction, expressio unius est exclusio alterius — the mention of one thing implies the exclusion of another. SeeGrenitz v. Tomlian, 858 So.2d 999, 1002 (Fla. 2003) (quotingMoonlit Waters Apartments, Inc. v. Cauley, 666 So.2d 898, 900
(Fla. 1996)). We also have recognized as a "general rule . . . that statutes in derogation of the common law are strictly construed." BellSouth Telecomm., Inc. v. Meeks, 863 So.2d 287,290 (Fla. 2003). Consistent with these principles, we conclude that section 287.055 applies only to the specific contracts it mentions and is irrelevant here.
Act Realty also relies on section 112.3217, Florida Statutes (2004), which prohibits lobbyists from receiving fees contingent on executive branch action. As defined in the statute, the term "lobbyists" includes those "seeking, on behalf of another person, to influence an agency with respect to a decision of the agency in the area of policy or procurement or an attempt to obtain the goodwill of an agency official or employee." § 112.3215(d)-(e), Fla. Stat. (2004). Act Realty contends that the brokers became lobbyists when they attempted to procure the sale of property to a government entity. We disagree. The Legislature has classified real estate brokerage as a distinct "professional service," and a body of statutes regulates that profession. §§ 475.001—475.5018, Fla. Stat. (2004). Those statutes impose on brokers the duties of loyalty, honesty, fair dealing, confidentiality, obedience, full disclosure, skill, care, and diligence — many of which tend to mitigate the dangers associated with contingency-fee payments. §475.278, Fla. Stat. (2004). We doubt that the Legislature intended for restrictions on the occupation of lobbying to cover the separately regulated profession of real estate brokerage. We therefore conclude that the restriction on contingency *Page 1188 
fees under section 112.3217 does not apply to real estate brokers acting in the ordinary course of their profession, as these brokers were.
The preceding analysis indicates that, while the Legislature has created exceptions to the "general rule" of Robert Co., it has left the core of the rule intact. We, too, leave the rule as it is. The doctrine of stare decisis counsels us to follow our precedents unless there has been "a significant change in circumstances after the adoption of the legal rule, or . . . an error in legal analysis." Dorsey v. State, 868 So.2d 1192, 1199
(Fla. 2003). Although fifty-seven years have passed since we decided Robert Co., the relevant circumstances have not significantly changed. Nor did that case involve an analytical error. We therefore apply the doctrine of stare decisis, which "provides stability to the law and to the society governed by that law." State v. Gray, 654 So.2d 552, 554 (Fla. 1995) (citing State v. Schopp, 653 So.2d 1016 (Fla. 1995) (Harding, J., dissenting)); see also Tyson v. Mattair, 8 Fla. 107, 124
(1858) (noting that a commitment to precedent helps "to keep the scale of justice even and steady").
The general rule continues to be that "an employment in which compensation is contingent on success in securing contracts from public officials is not illegal on its face," but rather is illegal only if shown at trial to involve "favors or corrupt means." Robert Co., 33 So.2d at 734. We see no reason why this general rule should not apply specifically to the real estate brokerage industry, in which contingency fees have long been the professional norm. We find it hard to imagine an industry in which good-faith reliance on Robert Co. has been more widespread. We therefore apply Robert Co.'s rule to this case. Because the trial record contains no evidence of corruption or improper influence, we quash the decision of the district court and hold that the brokerage agreement between the brokers and Act Realty complies with Florida public policy.
 B. Did the Brokers Procure the Sale?
The brokerage agreement provided that the brokers would receive all sales proceeds in excess of $1 million if they were "able to procure a sale [of Act Realty's property] with the school board of Dade County Florida as the buyer." At trial, the primary question was whether the brokers did, in fact, procure the eventual sale. The trial court found that they "clearly" did. According to the trial court, the brokers "proved that they initiated the negotiations, took affirmative action to bring the buyer and seller together, and that the transaction was closed and they were entitled to the agreed commission." Act Realty appealed this ruling to the district court, which did not reach the issue because it decided that the agreement was facially illegal. Because we quash the district court's decision on that issue, whether the brokers were a procuring cause of the sale becomes relevant.
Many Florida courts, over a long period of time, have discussed the requirements for "procuring" a real estate sale. SeeOsheroff v. Rauch Weaver Millsaps Co., 882 So.2d 503, 505
(Fla. 4th DCA 2004) (explaining that "[t]he law in this area has been well established for quite some time, although its application to a given set of facts is a bit more troublesome"),review denied, 898 So.2d 938 (Fla. 2005). The seminal case on the subject is Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876
(1944), where we explained that "[i]f the broker has brought the parties together and a sale is effected as a result of continuous negotiations inaugurated by him, he will not be defeated in his effort to recover compensation simply because of a variation *Page 1189 
between the original terms stated by the owner and those finally accepted." Id. at 878.
Interpreting Taylor, the district courts have recognized that to earn a commission a broker must perform two essential tasks: First, the broker must "initiate negotiations by doing some affirmative act to bring buyer and seller together." Ehringer v.Brookfield Assocs., 415 So.2d 774, 775-76 (Fla. 5th DCA 1982). Second, the broker must remain "involved in the continuing negotiations between the seller and the buyer," unless "the seller and buyer intentionally exclude the broker from the negotiations." Siegel v. Landquest, Inc., 761 So.2d 415, 417
(Fla. 5th DCA 2000) (citing Shuler v. Allen, 76 So.2d 879, 883
(Fla. 1955), and Sheldon Greene Assocs. v. Rosinda Invs.,N.V., 475 So.2d 925, 927 (Fla. 3d DCA 1985)), review denied,780 So.2d 914 (Fla. 2001). Whether a broker has performed these tasks "is a question of fact that the [fact-finder] must determine from the surrounding circumstances." Osheroff,882 So.2d at 505 (citing Easton-Babcock Assocs. v. Fernandez,706 So.2d 916 (Fla. 3d DCA 1998)). Appellate courts uphold such determinations when supported by competent, substantial evidence.See, e.g., Brickell Bayview Real Estate, Inc. v. Cooper,691 So.2d 1094, 1094 (Fla. 3d DCA 1997).
We conclude that competent, substantial evidence supports the trial court's finding that the brokers procured the sale of Act Realty's property to the School District. The record shows that the brokers initiated negotiations by faxing to the School District a letter authorizing them to negotiate the sale of Act Realty's property. At that point, the School District had already developed an interest in Act Realty's property, but had not yet contacted Act Realty to begin negotiations. In fact, Act Realty's owner testified that he "did not know that the School Board was interested" in his property when he met with the brokers. The brokers' fax was the "affirmative act" setting in motion the negotiations between Act Realty and the School District.Ehringer, 415 So.2d at 775.
The record also shows that the brokers remained "involved in the continuing negotiations." Siegel, 761 So.2d at 417. One of them, Martin-Hidalgo, testified that she communicated with the School District's real estate director "every couple weeks." She asked the director for a copy of the agenda that was presented to the school board at a preliminary hearing and forwarded it to Act Realty. She also "discussed the land and surrounding land values" with two of the School District's appraisers. When the District made its first offer of $800,000, she conveyed it to Act Realty and then reported back that it was too low. The other broker, Perez-Urrutia, advised Act Realty to negotiate the sales price jointly with Cease, who controlled the adjacent property. Act Realty apparently took his advice. Cease testified that he took over negotiations for both properties with respect to price. Perez-Urrutia thereafter maintained "constant contact" with Cease, speaking with him "practically every day." Thus, substantial, competent evidence supports the trial court's finding that the brokers were a procuring cause of the sale.
 III. CONCLUSION
We quash the decision of the district court and hold that a real estate broker may be paid a contingency fee for the sale of private property to the government, unless the sale was obtained through corruption or improper influence. We affirm the trial court's ruling that the brokers were *Page 1190 
the procuring cause of the sale and are entitled to a commission.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE and BELL, JJ., concur.
[1] The brokers also argue that the district court's decision to raise the "illegality of contract" defense on its own motion conflicts with Busot v. Busot, 338 So.2d 1332 (Fla. 2d DCA 1976), and with Robert Co. We see no conflict on this issue. Those two cases hold that when a contract is valid on its face, the defense of illegality must be pleaded and proved at trial.See Robert Co., 33 So.2d at 734; Busot, 338 So.2d at 1334
(citing Lee v. Clearwater Growers Ass'n, 93 Fla. 214,111 So. 722 (1927)). In this case, the district court concluded that the agreement was not valid on its face. See Act Realty,863 So.2d at 337. We have long recognized that the facial illegality of a contract may be raised sua sponte by any court. See,e.g., Citizens' Bank Trust Co. v. Mabry, 102 Fla. 1084,136 So. 714, 717 (1931). We disagree not with the district court's decision to raise this issue, but with its conclusion that the contract was facially invalid.
[2] Act Realty cites the statute's preamble, which "declares it is in the public interest to prohibit the payment of contingent fees or other considerations for obtaining state, municipal or other professional service contracts financed from public funds." Ch. 73-19, Laws of Fla. But this statement is less expansive than it appears, because the statute expressly defines the term "professional service contracts" to include only contracts involving architecture, engineering, landscape architecture, surveying, or mapping. § 287.055(2)(a), Fla. Stat. (2004).