IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D13-5232

WELLS CAPITAL
INVESTMENTS, LLC,

      Appellant,

v.

EXIT 1 STOP REALTY,

      Appellee.

_____/

Opinion filed September 12, 2014.

An appeal from the Circuit Court for Duval County.
Hugh A. Carithers, Judge.

Roger K. Gannam of Lindell & Farson, Jacksonville, for Appellant.

Gary B. Tullis, Jacksonville, for Appellee.


OSTERHAUS, J.

      Appellant Wells Capital Investments, LLC, appeals a judgment requiring it to pay a commission on the sale of its property to Appellee Exit 1 Stop Realty, a real estate broker. Appellant argues that no commission is due because Exit 1 Stop voluntarily abandoned the sales brokerage commission agreement that the parties entered in 2009, long before the negotiation and final sale of the property in 2012.

We agree and reverse. Because Exit 1 Stop stopped marketing and communicating with the seller about the subject property three years before the negotiations leading to the sale, we conclude that it abandoned the commission agreement as a matter of law and may not recover an agreement-related commission.

I.

The pertinent facts in this case are not disputed. In 2009, Wells Capital, a commercial real estate developer in Jacksonville, owned two contiguous parcels of land in Orange Park that it wished to lease or sell. In the spring of 2009, General RV (GRV) contacted Exit 1 Stop, a real estate brokerage firm, looking for Jacksonville-area land for its RV business. Recognizing that one of the parcels offered by Wells Capital might suit GRV ("Parcel 1"), Exit 1 Stop entered into a sale and lease commission agreement with Wells Capital in May 2009. Under the agreement, it would receive a commission if Parcel 1 was sold or leased to GRV (Parcel 1 Agreement). The agreement contained no expiration date, but it permitted Wells Capital to continue marketing Parcel 1 to others. Another party ultimately signed a ten-year lease for Parcel 1, so Exit 1 Stop received no commission. At that point, Exit 1 Stop ceased marketing or communicating with Wells Capital about Parcel 1.

Instead, the parties shifted their focus to Wells Capital's other property ("Parcel 2"). Wells Capital and Exit 1 Stop signed a second sale and lease

2

commission agreement for Parcel 2 that mirrored their prior agreement. GRV ultimately leased Parcel 2 in late 2009 (and subsequently bought it), earning Exit 1 Stop a commission under the Parcel 2 agreement.

Years passed and the tenant leasing Parcel 1 from Wells Capital fell on hard times, requiring the lease on Parcel 1 to be terminated in March 2012. Wells Capital began to market Parcel 1 a second time and, as part of this effort, pitched a sale of the property directly to GRV without involving Exit 1 Stop. After months of negotiating they struck a deal and GRV bought the property in June 2012.

After the sale closed, Exit 1 Stop learned of the sale and sought a sales commission. Wells Capital refused and Exit 1 Stop sued. Later, the trial court held a non-jury trial on the issue of whether Wells Capital owed a sales commission on Parcel 1 under the 2009 agreement and Exit 1 Stop prevailed. The trial court noted that the Parcel 1 Agreement had no express termination date, but considered it still to be binding because Exit 1 Stop had brought the parties together initially and would have helped negotiate the final sale but for its exclusion by Wells Capital and GRV. The trial court ordered Wells Capital to pay a $60,000 commission to Exit 1 Stop on the Parcel 1 sale. Wells Capital then appealed.

## II.

Because the material facts in this case aren't disputed, the issue of whether Exit 1 Stop forfeited its right to a sales commission by abandoning the 2009

3

agreement is an issue of law, subject to de novo review. See Richland Grove &

Cattle Co. v. Easterling, 526 So. 2d 685, 686 (Fla. 1988). In Richland Grove, the

Florida Supreme Court held that the failure to specify a time period in a brokerage

agreement "does not give rise to a 'brokerage in perpetuity.'" Id. at 687 (citation

and internal quotations omitted). Instead, when a real estate broker's contract does

not provide a time for performance, the law implies a "reasonable time limitation,"

requiring a broker to procure a purchaser within a reasonable time. Id.; see also

Shuler v. Allen, 76 So. 2d 879, 882 (Fla. 1955). A brokerage agreement terminates

if the broker abandons efforts to find a purchaser.

> If the broker voluntarily abandons his efforts, once begun, to find
> a purchaser for property, or fails to find one within a reasonable
> time, all without the fault of the owner, then his contract of
> employment is at an end, and thereafter the owner is at liberty to
> sell the property to anyone.

Richland Grove, 526 So. 2d at 687 (quoting Parkey v. Lawrence, 284 S.W. 283,

287 (Tex. Civ. App. 1926)). A dispositive factor in evaluating whether a brokerage

agreement has been abandoned is whether the broker and seller continued

communicating about the property from the time of the agreement until the sale. Id.

In this case, the undisputed evidence shows that Exit 1 Stop abandoned the

2009 brokerage agreement involving Parcel 1. As noted by the trial court, Exit 1

Stop "ceased its efforts to market [Parcel 1] to GRV" after a third entity leased the

property in 2009. At that time, the parties also switched their focus from Parcel 1

4

to Parcel 2, a different parcel than the one at issue here. The parties ultimately negotiated a lease (and a later sale) of that parcel to Exit 1 Stop's client, GRV. But besides the flurry of activity in 2009, culminating in the lease of Parcel 2 by GRV, Exit 1 Stop had no further communication with Wells Capital about Parcel 1. Instead, all remained quiet as to Parcel 1 for about three years, at which time the parcel became available again and Wells Capital and GRV negotiated its sale directly with each other.

The three years of silence and total inactivity by Exit 1 Stop, where the parties' brokerage agreement had not specified a time period for performance, constituted legal abandonment of the Parcel 1 brokerage agreement. A number of cases confirm this conclusion. See, e.g., id. at 686 ("We find that the question is one of law where, as in this case, the broker did not contact the seller concerning the specific property for a period of two and one-half years. That circumstance requires a finding that the contract was abandoned."); Wilkins v. W. B. Tilton Real Estate and Ins., Inc., 257 So. 2d 573, 575 (Fla. 4th DCA 1971) (finding abandonment where the broker had no contact with seller for nineteen months although broker continued to advertise property and to show property to prospective buyers); Shuler, 76 So. 2d at 882 (finding seventeen-month gap constituted abandonment). And it makes no difference that Wells Capital ultimately sold the property to a buyer that was first introduced by Exit 1 Stop.

5

Once a contract is abandoned, a seller is free to sell its property to anyone, "including the purchaser first found by the broker, either by means of negotiations directly with the purchaser or through the medium of another broker." Richland Grove, 526 So. 2d at 687 (quoting Parkey, 284 S.W. at 287); see also Shuler, 76 So. 2d at 882.

We recognize that the trial court analyzed this case differently, awarding Exit 1 Stop a commission on the basis of the "procuring cause" analysis in Rotemi Realty, Inc. v. Act Realty Co., 911 So. 2d 1181 (Fla. 2005). The circumstances here are different than in Rotemi Realty. The commission dispute in Rotemi Realty arose in the context of deciding whether one broker remained entitled to a commission where another broker and attorney assumed the lead role in negotiating the sale of a property. Unlike this case, Rotemi Realty did not address abandonment due to a substantial time gap in the communications between the broker and seller. Rather, the broker seeking the commission in Rotemi Realty remained involved in the continuing negotiations—she conveyed the first offer, reported back the rejection of that offer, regularly communicated with the prospective buyer, and "maintained 'constant contact' with [the attorney who took over the negotiations], speaking with him 'practically every day.'" Id. at 1189. The key point for the court in Rotemi Realty was that the broker had both "initiated" and "remained involved in the continuing negotiations." Id.

6

Here, by contrast, Exit 1 Stop initially introduced Wells Capital and GRV in 2009, but then stopped communicating with Wells Capital about Parcel 1 and ceased marketing efforts for a three-year period prior to the start of the negotiations leading to the sale of Parcel 1. No "continuing negotiations" occurred in this case. And during the three-year gap, Exit 1 Stop did nothing in the mode of laying groundwork related to GRV's future purchase of Parcel 1. Under these circumstances, we decline Exit 1 Stop's invitation to depart from the long-settled legal test of abandonment.

### III.

We thus conclude that Exit 1 Stop abandoned the 2009 Parcel 1 Agreement as a matter of law, and that Wells Capital was free to negotiate and sell the property directly to GRV without any obligation to pay a commission to Exit 1 Stop under that agreement. For this reason, the judgment is reversed and this case is remanded with instructions to enter judgment in favor of the Appellant.

REVERSED AND REMANDED.

THOMAS, and RAY, JJ., CONCUR.

7