THOMAS, Judge.
Ellen Holsombeck ("the wife") appeals from a judgment of the Jefferson Circuit Court in favor of USAmeriBank f/k/a Aliant Bank ("the bank"). The bank sued Stan Holsombeck ("the husband"), the wife, and Holsombeck Builders, Inc. ("HB"), claiming that the husband and the wife transferred certain property to the *93 wife in 2013, pursuant to a divorce settlement agreement, to prevent the bank from collecting damages. See § 8-9A-1 et seq., Ala. Code 1975, the Alabama Fraudulent Transfer Act ("the AFTA"); American Nat'l Red Cross v. ASD Specialty Healthcare, Inc., 888 So.2d 464, 465 (Ala. 2003) ("The purpose of the [AFTA] is to prohibit the fraudulent transfer of property by a debtor 'who intends to defraud creditors by placing assets beyond their reach.' Thompson Props. v. Birmingham Hide & Tallow Co., 839 So.2d 629, 632 (Ala. 2002).").
The record indicates the following. The husband and the wife were married in 1982. In September 2011 HB executed six separate notes for business loans that were secured by mortgages. The husband was the guarantor of the six notes. In October 2013 the wife sued the husband for a divorce, and they filed a divorce settlement agreement in the circuit court. In November 2013 the circuit court entered a judgment divorcing the husband and the wife and dividing the marital property pursuant to the terms of the divorce settlement agreement, which the circuit court incorporated into the divorce judgment. Despite the fact that the husband had listed the marital residence as security for the six notes, the divorce judgment provided, among other things, that the wife retained the $250,000 marital residence and that the husband was responsible for paying the remaining $18,000 mortgage debt associated with the marital residence.
After negotiating agreements with the bank to extend the deadlines for repayment of the six notes until December 2014, HB and the husband defaulted on the six notes, and the bank sued HB and the husband, seeking damages for breach of contract. The bank filed an amended complaint, adding the wife as a defendant and alleging an additional count of fraudulent transfer of the marital residence. Thereafter, the bank filed a motion for a partial summary judgment regarding all claims except its claim of fraudulent transfer. The circuit court entered a partial summary judgment in favor of the bank and conducted a trial on the remaining fraudulent-transfer claim.
The circuit court entered a judgment in favor of the bank on April 18, 2017, as clarified on June 16, 2017, concluding that the marital residence and $75,000 from the husband's and the wife's joint savings account[1] had been fraudulently transferred and were subject to the bank's enforcement rights as a judgment creditor. The wife filed a postjudgment motion, which the circuit court denied. The wife filed a timely notice of appeal to the Alabama Supreme Court. The appeal was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala. Code 1975.
*94 The wife argues that the circuit court improperly concluded that she "fraudulently transferred property" and misapplied "the law upon its own 'finding of fact.' "
" 'Where ore tenus evidence is presented to the trial court, a presumption of correctness exists as to the court's findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.' Odom v. Hull, 658 So.2d 442, 444 (Ala. 1995)."
Hope Developers, Inc. v. Vandiver, 665 So.2d 910, 913 (Ala. 1995).
At the beginning of the trial, the bank's attorney said:
"[T]he single motion in this case is whether or not [the husband] fraudulently transferred his interest in the [marital residence] to [the wife]. [The husband] owed the bank about $650,000. He was unable to pay the bill. It was not going good so he transfers his interest in his property to his wife pursuant to the divorce decree. He's never even moved out of the house."
The husband's and HB's attorney said:
"We allege it's not fraudulent transfer. We allege that at the time of the divorce [the husband] was still paying on that debt. He had debt before he got a divorce. He had debt after he got a divorce. He was in a business that could have turned around the next week and we wouldn't even be sitting here. It's not a matter of transferring for fraudulent reasons. It was transferring ... because she wanted a divorce and if we had gone to a court of equity and had a judge decide, the judge would have done basically what these two adults did and that's ... an equitable division of the property."
The wife testified that she decided to pursue a divorce from the husband after 31 years of marriage when she and the husband began to disagree regarding their finances. Specifically, she testified that the husband negotiated loans for HB without her knowledge, that the husband could not pay HB's bills after his business partner stole money from HB, and that the husband used funds from their joint savings account for HB's expenses against her express wishes. The wife testified that in 2010 she withdrew $100,000 from their Aliant Bank joint savings account without informing the husband and that she deposited the entire amount in their Regions Bank joint savings account, and, she testified: "I think $75,000 was put back in Aliant eventually." She testified that, after the divorce judgment was entered, the Regions Bank joint savings account became her savings account and contained a current balance of $76,000.
The wife testified that her attorney had drafted the divorce settlement agreement, that the husband had not retained an attorney in the divorce action, and that the divorce had been accomplished within two months. Both the husband and the wife testified that they had not engaged in any dating or romantic relationships since 2011. The husband, the wife, and James Daniel (a private investigator) were each questioned regarding whether the husband had moved out of the marital residence. The judgment reads:
"The Court believes [the wife]'s testimony was evasive at times, and her memory was good on some issues when questioned, but failed her when questioned on other issues. When asked whether after the divorce [the husband] moved out of their house, [the wife] testified she wasn't sure, but she knew he was sleeping somewhere else at times. She subsequently admitted that [the *95 husband] was living with her as of the date she testified in this trial.
"[The husband]'s memory also failed him at times. He testified he had another business, staining concrete, and that during that time he 'traveled a lot' but could not specifically say when, nor could he say exactly where he stayed while in Trussville. Although it became his legal obligation to pay the mortgage on [the marital residence], [the husband] couldn't remember if he had, but if he had made payments, he couldn't remember how many and when. The evidence showed as of the date of the divorce agreement, the balance of the mortgage on the [marital residence] was approximately $18,000.00, but as of trial the balance was approximately $4,000.00. On his 20l3 U.S. tax return, filed well after his divorce was finalized and the date he executed the quitclaim deed [on the marital residence] to [the wife], [the husband] listed the address for [HB] [as the address of the marital residence], and listed himself as an owner of the [marital residence]."
Although Daniel's testimony is not mentioned in the judgment, he testified that he had observed daily activity outside the marital residence for four to six weeks in 2015. Daniel said: "[The husband] was home almost every night. There were perhaps a few nights that [the husband's] vehicle was not there, but for the most part his vehicle was at the [marital] residence."
The husband testified that he had executed the six notes on behalf of HB on September 5, 2011, and that each had a maturity date of September 5, 2014. The husband offered into evidence two documents that he described as personal financial statements that he had provided to the bank. The document dated 2013, which is before the wife filed the divorce complaint, listed the marital residence as his asset; the document dated 2014, which is after the divorce judgment was entered, did not include the marital residence as his asset. The husband testified that that disclosure and the fact that he had made payments on the six notes for more than one year after the divorce judgment was entered demonstrated that no fraudulent transfers had occurred.
Darryl Spears, an employee of the bank, testified that in May 2014 he requested certain financial information from the husband in order to complete a December 2014 renewal of the six notes. Spears said that the husband did not provide all the required information and that HB and the husband entered into a 90-day extension rather than a one-year renewal. Donna Coleman, an employee of the bank, testified that she had been responsible for servicing HB's and the husband's loans. She confirmed that, when the six notes matured in September 2014, HB and the husband paid a fee and the applicable interest to acquire a short-term extension rather than a one-year renewal because the husband did not provide all the required information for a one-year renewal. Coleman testified that the bank also allowed at least two more short-term extensions before the husband communicated to her that he was "tired of paying the interest" and defaulted on the six notes.
The wife argues on appeal that the circuit court misapplied the AFTA to determine that the division of marital assets constituted a fraudulent transfer.
"Under most circumstances, the AFTA is not applicable to divisions of marital property between divorcing spouses.
"In discussing the AFTA, this court has written:
" 'Two types of fraudulent transfers, actual and constructive, are within the scope of the [AFTA]. See *96 McPherson Oil Co. v. Massey, 643 So.2d 595 (Ala. 1994). An actual fraudulent transfer is one made by a debtor who transfers assets "with actual intent to hinder, delay, or defraud any creditor of the debtor." Ala. Code 1975, § 8-9A-4(a). The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer. Ala. Code 1975, § 8-9A-4(b) ; McPherson Oil, supra. A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of the transfer. Ala. Code 1975, § 8-9A-5(a) ; McPherson Oil, supra. '
" Varner v. Varner, 662 So.2d 273, 276 (Ala. Civ. App. 1994)."
Aliant Bank v. Davis, 198 So.3d 508, 511-12 (Ala. Civ. App. 2015) (footnote omitted).
In Res-Ga Lake Shadow, LLC v. Kennedy, 227 So.3d 522 (Ala. Civ. App. 2017), a trial court, in misplaced reliance on Aliant, had dismissed certain fraudulent-transfer claims made pursuant to the AFTA in the context of a divorce settlement agreement. We reversed the judgment and remanded the cause, and, in doing so, we discussed and clarified our holding in Aliant.
"[I]n Aliant, this court explained what constituted a fraudulent transfer under the AFTA and compared that definition with the purpose behind dividing marital property in a divorce, which does not require an exchange of money between divorcing spouses for such property transfers to be valid. We also examined the evidence before the trial court in light of the issues that Aliant had presented to this court, noting that,
" '[i]n this case, [Shirley] and Alfred had been married for 53 years before Alfred moved out of the residence to begin living with his girlfriend and had been married for 55 years at the time the divorce judgment was entered. At the time Alfred moved out of the marital residence, [his building company] had not defaulted on the loan at issue, and, as the trial court pointed out, [Shirley] and Alfred separated about two years before Aliant filed its action against Alfred and [his building company that ultimately resulted in a judgment against Alfred and his building company] and about three and one-half years before it filed this action [against Shirley]. Based on the record before us, we conclude that substantial evidence supports the trial court's finding that Alfred conveyed the marital compound to [Shirley] without an actual intent to hinder, delay, or defraud Aliant. See § 8-9A-4(a).
" 'For the reasons set forth above, we conclude that the AFTA has no application as to the division of the marital property in this case.'
" Id. at 513 (emphasis added). In other words, after considering the facts and the issues presented in Aliant, we rejected Aliant's assertion that ' "the trial court erred in considering the factors used to divide marital property as a basis for determining that [Alfred] received 'reasonably equivalent value' for his transfers to [Shirley]," ' id., or otherwise divided the marital property with the intent to defraud Alfred's creditors.
"We take this opportunity to reiterate that our holding in Aliant did not declare that a division of marital property in a divorce action can never violate the AFTA. Whether the AFTA applies in a given situation should be determined on a case-by-case basis. We find instructive *97 the opinion in Canty v. Otto, 304 Conn. 546, 41 A.3d 280 (2012). In that case, the Supreme Court of Connecticut affirmed a judgment allowing a creditor to use the Uniform Fraudulent Transfer Act, similar to the AFTA, to reach assets that had been transferred to Otto's wife in 'a hurried fashion' during a divorce that Otto and his wife did not desire, but which Otto 'encouraged and facilitated' to protect his assets so that they could not be reached by the plaintiff in a wrongful-death action against him. 304 Conn. at 551-52, 41 A.3d at 285. To be clear, we explicitly hold that there is no prohibition on a creditor's ability to seek relief under the AFTA based on an allegation that an agreement to transfer marital assets in a divorce action was made with the intention of hindering, delaying, or defrauding a creditor of a spouse. See § 8-9A-4(a), Ala. Code 1975. Because the evidence indicated no such intention on the part of Shirley and Alfred in Aliant, we concluded that the AFTA had no application under the facts of that case. Aliant, 198 So.3d at 513."
Lake Shadow, 227 So.3d at 526-27.
In this case, the circuit court could have properly inferred from the evidence presented that the AFTA is applicable to the division of the marital assets. "Because the intent to defraud creditors is rarely susceptible of direct proof, courts continue to rely on 'badges of fraud' to determine whether a transfer is fraudulent." Citizens State Bank Norwood Young America v. Brown, 849 N.W.2d 55, 60 (Minn. 2014). Section 8-9A-4(a), Ala. Code 1975, provides: "A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." "Transfer," as defined by § 8-9A-1(13), is "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." "Debtor," as defined by § 8-9A-1(6), is "[a] person who is liable on a claim." The husband is the debtor. "Creditor," as defined by § 8-9A-1(4), is "[a] person who has a claim." The bank is the creditor.
Section 8-9A-4(b) provides: "In determining actual intent under subsection (a), consideration may be given" to 11 factors-the badges of fraud-provided by § 8-9A-4(b)(1) through (11). The circuit court heard testimony supporting at least three factors indicative of actual fraud regarding the transfer of the marital assets.
First, § 8-9A-4(b)(1) provides that a trial court may consider evidence demonstrating that the "transfer was to an insider." "Insider," as defined by § 8-9A-1(8) a.1., in pertinent part, is "[a] relative of the debtor." "Relative," as defined by § 8-9A-1(12), in pertinent part, includes "a spouse." The husband and the wife created the divorce settlement agreement during the marriage; therefore, the circuit court could have properly concluded that the wife had been a relative of the husband and, therefore, an insider.[2]
Second, § 8-9A-4(b)(2) provides that a trial court may consider evidence demonstrating that "[t]he debtor retained possession or control of the property transferred after the transfer." In this *98 case, the circuit court clearly believed that the husband and the wife continued to live as a couple after the transfers of the marital assets. In ore tenus proceedings, the trial court is " 'the sole judge of the facts and of the credibility of witnesses' and 'we are required to review the evidence in a light most favorable to the prevailing part[y].' " Architectura, Inc. v. Miller, 769 So.2d 330, 332 (Ala. Civ. App. 2000) (quoting Driver v. Hice, 618 So.2d 129, 131 (Ala. Civ. App. 1993) ). We cannot say that the husband demonstrated that he lacked possession or control of the marital assets-specifically the marital residence-after the transfer, especially in light of the circuit court's finding that the husband claimed ownership of the marital residence on tax documents that were filed after the divorce judgment was entered and after the husband executed a quitclaim deed to the wife.
Finally, § 8-9A-4(b)(10) provides that a trial court may consider evidence demonstrating that the "transfer occurred shortly before or shortly after a substantial debt was incurred." Testimony indicated that HB was in financial trouble as early as 2010, that the husband incurred a substantial debt (became the guarantor of the six notes) in September 2011, that the circuit court had entered the divorce judgment in October 2013, and that, by May 2014, the husband had failed to provide certain financial documentation to the bank and had, instead, negotiated a series of short-term extensions. The evidence presented supports a conclusion that the transfers of the marital assets in 2013 occurred shortly after the husband incurred substantial debt in 2011.
In conclusion, substantial evidence supports the circuit court's determination that the divorce settlement agreement had been crafted to transfer the husband's interest in the marital assets to the wife with an actual intent to hinder, delay, or defraud the bank based upon the circuit court's consideration of the factors provided by § 8-9A-4(b). The circuit court's judgment is not clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442, 444 (Ala. 1995). Therefore, the judgment is affirmed.
AFFIRMED.
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.

No issue regarding a fraudulent transfer of cash assets had been raised in the pleadings; however, the judgment reads, in pertinent part:
"At trial, after ... testimony [regarding the husband's and the wife's joint banking accounts], [the bank] moved orally to amend its AMENDED COMPLAINT to include a fraudulent transfer claim regarding [the wife]'s removing [the husband]'s name from one or more accounts. Thus, the Court CONSIDERS [the bank]'s fraudulent-transfer claim as to these accounts was tried by express and/or implied consent of all parties."
(Capitalization in original.) The transcript does not include any oral motion. However, because the wife has not raised any issue regarding the accuracy of the circuit court's conclusion that the issue had been tried by the consent of the parties, we need not consider it. See Gary v. Crouch, 923 So.2d 1130, 1136 (Ala. Civ. App. 2005) (explaining that "arguments not raised by the parties [on appeal] are waived").

See also Morris v. Nance, 132 Or. App. 216, 224, 888 P.2d 571, 576 (1994) (citing Matter of Holloway, 955 F.2d 1008, 1011 (5th Cir. 1992) ) (holding that, in some circumstances, a former spouse of debtor can be an insider).